# EXHIBIT C

ZUKERMAN GORE & BRANDEIS, LLP
John K. Crossman
900 Third Avenue
New York, New York 10022
(212) 223-6700
*Attorneys for Taylors International Services Limited*

BEFORE AN ARBITRAL TRIBUNAL OF THE
INTERNATIONAL COURT OF ARBITRATION
OF THE INTERNATIONAL CHAMBER OF COMMERCE
---------------------------------------------------------------x
TAYLORS INTERNATIONAL SERVICES         :
LIMITED,                                :
                                        :
                    Claimant,           :
                                        :
       - against -                      :     **REQUEST FOR ARBITRATION**
                                        :
                                        :
ESSO EXPLORATION AND PRODUCTION         :
CHAD INC.,                              :
                                        :
                    Respondent.         :
---------------------------------------------------------------x



TO THE SECRETARIAT OF THE INTERNATIONAL COURT OF ARBITRATION:

Claimant Taylors International Services Limited ("Taylors" or "Claimant") respectfully submits this Request for Arbitration to be held in New York, New York, U.S.A., before an Arbitral Tribunal of a sole arbitrator constituted under the Rules of Arbitration of the International Chamber of Commerce and states as follows:

**PRELIMINARY STATEMENT**

1. This is a dispute arising out of and related to a contract under which Claimant provided catering and general camp services in support of Esso Exploration and Production Chad

Inc.'s ("Esso Chad" or "Respondent") petroleum production operations in the Republic of Chad (the "Catering Contract") (attached hereto as Exhibit A).

2. Taylors has over 60 years' experience supplying such services, and as it has always done, it fully met its obligations to provide high-quality catering services. Esso Chad never indicated any lack of satisfaction with those services.

3. Despite this performance, Esso Chad improperly and prematurely terminated the Catering Contract and turned the concession over to Taylors' former on-site manager. That manager, it is now clear, betrayed the confidence and trust placed in him by Taylors and engineered Taylors' ouster in order to obtain the business for his personal benefit. Further, Esso Chad not only knew of the manager's betrayal, but desired, supported, aided and abetted it.

4. This plan to cause early termination – the first in Taylors' history – was made possible chiefly by two factors. First, at Esso Chad's request, Taylors heavily relied on local suppliers. Thus, most of Taylors' expenses were in local currency, which experienced an over 30% rise in value relative to the U.S. dollar, in which payments to Taylors were made. The rising losses under the contract were made worse by the manager's secret performance of additional, unremunerated services in an attempt, it would appear in hindsight, to curry personal favor with Esso Chad and its personnel, some of whom were longtime associates of the manager, with the ultimate goal being to receive improper treatment and assistance from Esso Chad, to the detriment of Taylors.

5. In addition, the drilling site in Chad was extremely remote, and all access to the site was under the complete control of Esso Chad. This control prevented Taylors from exercising any close scrutiny of the actions of its manager and necessitated the placing of trust in the senior on-site manager. When the contract was ultimately terminated, Esso Chad further used its

complete control to hinder Taylors from retrieving its records from the site, and to prevent the recovery of its assets, and to prevent enforcement of its employees' contractual obligations. Instead, Esso Chad converted Taylors' property to its own use and delivered it into the hands of Taylors' former employees, in violation of its obligations under the Catering Contract and in a further abetting of those former employees' breach of their fiduciary duties to Taylor.

6. Finally, in addition to the improper termination of the Catering Contract and the conversion of its property, Esso Chad has not paid valid invoices Taylors has submitted for services rendered prior to the termination.

7. In this arbitration, Taylors seeks damages for Esso Chad's failure to pay its obligations under the Catering Contract, for its conversion of Taylors' assets, and for its abetting of the breach of fiduciary duty through which Taylors' former manager engineered Taylors' ouster.

## BASIS FOR ARBITRATION

8. This Request is based on the agreement of the parties to arbitrate as found in the Catering Contract, which states in part as follows:

> Any controversies or claims between the parties hereto arising out of or relating to this Agreement or the breach thereof may, at the election of ESSO [Respondent] or CONTRACTOR [Claimant], be settled by arbitration in accordance with the commercial rules of the International Chamber of Commerce . . . .

Catering Contract § 18.1. The claims asserted herein arise out of and relate to the Catering Contract and Respondent's breach thereof, and are therefore arbitrable at the election of either party.

## PARTIES

9. Claimant Taylors International Services Ltd. is a corporation organized under the laws of Alderney, Channel Islands with its principal place of business in Alderney. Its address is

>Taylors International Services Ltd.
>5/7 St. Anne's House
>P.O. Box 37, Victoria Street
>Alderney, Channel Islands.

Taylors is in the business of providing catering and other support services, often in remote parts of the world.

10. Respondent Esso Exploration and Production Chad Inc. ("Esso Chad") is a corporation organized under the laws of the State of Delaware, United States, and has its principal place of business in the Republic of Chad. Esso Chad's address is

>Esso Exploration and Production Chad Inc.
>16945 Northchase Drive, 8th Floor
>Houston, TX 77060
>United States of America

Esso Chad is in the business of petroleum exploration and production and is a subsidiary of Exxon Mobil Corporation.

## FACTUAL ALLEGATIONS

11. The Chad Cameroon Project (the "Project") is an undertaking by a consortium of petroleum companies (ExxonMobil, Petronas, and Chevron Texaco) to develop oilfields in southern Chad and to construct a petroleum pipeline through neighboring Cameroon to the Atlantic Ocean. Esso Chad serves as the operator of the Project.

12. The drilling site is in an extremely remote part of Chad. Esso Chad maintains complete control of access to its sites, and they are accessible only through transportation provided by Esso Chad. Esso Chad is the *de facto* government of the Project site.

13. In mid-2001, Esso Chad initiated a competitive bidding process for a contract to provide catering and general camp services (janitorial, laundry, etc.) for the Project. Glen Beal, in Kingwood, Texas (a suburb of Houston), then-Vice President of Business Development for

Taylors, submitted a bid on behalf of Taylors in September 2001. Taylors was the successful bidder in the competition.

14. Taylors and Esso Chad thereafter entered into the Catering Contract that forms the basis of this dispute on October 1, 2001. It was executed on behalf of Esso Chad by Lee B. Garza, and on behalf of Taylors by Beal. Beal conducted all discussions with Esso Chad essentially by himself. Beal's longtime associate, Dan Deer, primarily negotiated on Esso Chad's behalf.

15. The Catering Contract was drafted by Esso Chad and presented to Beal with no opportunity for negotiation with respect to its terms.

16. The Catering Contract required Taylors to provide catering and general camp services – i.e., primarily, the provision of meals for the Project Workers, laundry and janitorial services – for two drilling camps, the Kobe Base Camp and a Remote Drilling Camp. (Catering Contract § 1; Ex. A.) Taylors was responsible for the procurement of all supplies, including food, for the provision and maintenance of its equipment, and for the hiring, supervision, and payment of personnel necessary to provide the required services.

17. In exchange, the Catering Contract provided for payment by Esso Chad of a fixed price, in U.S. dollars, per man-day of labor employed in the Project. (Catering Contract Ex. C.) For example, referring to Exhibit C, for every Expatriate or "Third Country National" ("TCN") resident at the Kome Base Camp (up to 350 total), Taylors was to receive a payment of $16.50 per man-day. The reimbursement for Chadian Nationals was to be $5.50 per man-day. From this amount, Taylors was expected to pay for food, supplies, and labor.

18. Esso Chad also required Taylors to use local Chadian labor and suppliers as much as possible. (Catering Contract § 3.2.)

19. The term of the Catering Contract was for three years, with the possibility of extension. (Catering Contract § 13.1.)

20. Taylors began performance under the Catering Contract on or about November 1, 2001. At the suggestion of Glen Beal, operations were supervised by Vince Melvin, Vice President of Taylors International Chad, a wholly owned subsidiary of Taylors International Services Limited. Mr. Melvin was a longtime associate and business colleague of both Glen Beal, who procured and negotiated the Catering Contract on behalf of Taylors, and Bob Baker, the Kome Base Camp administrator for Esso Chad.

21. Taylors performed its obligations under the Catering Contract and supplied quality services to the Project. Esso Chad never had any significant complaints about Taylors' service quality.

22. Almost from the inception of the Catering Contract, the value of the local Chadian currency – the CFA (Communaute Financiere Africaine) Franc (FCFA) – began to rise relative to the U.S. dollar. The FCFA, formerly tied to the French franc, is now tied to the Euro and thus began experiencing a steady rise against the dollar beginning in early 2002 and continuing through the end of 2003. The Euro (and therefore the FCFA) gained over 30% in value versus the dollar from October 2001 to December 2003.

23. As most of Taylors' suppliers and laborers were – at Esso Chad's request – Chadian, and therefore most of Taylors expenses – some 80% – were payable in CFA Francs, Taylors began to experience a steep rise in costs relative to its fixed (in U.S. dollars) revenue.

24. In May 2002, Esso Chad agreed to 25% across-the-board increase in the man-day rate (for example, from $16.50 to $20.63 per man-day for Expatriates and TCN's up to 350 total). The reason for this increase was that Taylors had had only limited ability prior to the contract to

assess supply costs in this extremely remote setting, and the cost both to procure supplies locally and to have them shipped in was substantially higher than anticipated. Taylors had the right under the contract to buy abroad in dollars if it was more economical. But reductions in local purchasing would have been undesirable for Esso Chad's public relations. After Taylors explained the situation, Esso Chad agreed to the rate increase rather than any risk any diminution in the quality of service or local attitudes.

25. However, despite this increase, Taylors continued to be squeezed by the weakening U.S. dollar. By early 2003, Taylors was losing approximately $100,000 per month on the Catering Contract. Taylors continued at all times, however, to fulfill its catering and general services obligations to Esso Chad with no diminution in quality and with no complaints from Esso Chad.

26. In June 2003, Taylors discussed the increasingly difficult economic situation with representatives of Esso Chad. These representatives told Taylors that there was a procedure within the ExxonMobil organization for a supplier to request a "hardship" payment and urged Taylors to apply for retroactive relief through those channels.

27. Esso Chad led Taylors to believe that such a request would be fairly considered. Accordingly, on July 2, 2003, Taylors Chairman H.N.A. "Sandy" Goodman wrote to Dan Deer of Esso Chad to request financial relief. In a conference call on July 14, 2003, Esso Chad confirmed that the hardship claim was being reviewed and suggested that an offer of some kind would soon be forthcoming. However, no formal response was ever forthcoming. In the meantime, despite its mounting losses, Taylors continued to supply services to Esso Chad's satisfaction.

28. In the months following Taylors' requests for a hardship payment, billing to Taylors from food suppliers increased substantially, despite there being no significant increase in Esso Chad camp personnel. For example, the average billing for the first five months of 2003 was $117,000 per month; from August through the termination in mid-December, the billing was twice that, or $234,000 per month. Mr. Melvin was in charge of supervising orders placed to suppliers for Taylors' account.

29. During 2003, Mr. Melvin continued to assure his superiors at Taylors that he had taken steps to return the operations to profitability.

30. By the beginning of December, Taylors had suffered some $1.85 million in losses under the Catering Contract.

31. On or about December 15, 2003, Mr. Melvin wrote to Esso Chad and again asked for financial relief, this time in the form of an increase in the man-day rate and a retroactive hardship payment. Although Melvin informed Taylors that the Esso Chad had told him it had agreed to increase the man-day rate to $27, Esso Chad never issued a contract amendment or formally confirmed this in any manner.

32. In that letter of December 15, Mr. Melvin admitted several things that he, as manager of Taylors, had purportedly done to increase services to Esso Chad. These additional services were not required by the Catering Contract and were done at Taylors' expense with no adjustments to the contract rate. Provision of such services was outside the scope of Melvin's authority. The letter of December 15 was the first time anyone at Taylors other than Melvin had heard of these additional services. These services unjustly enriched Esso Chad at Taylors' expense.

33. Mr. Melvin continued to express concern to Taylors' management about its ability to continue under the contract. Further, Mr. Melvin told Taylors' management that Esso Chad was demanding that a payment of $850,000 be made immediately to Taylors' suppliers or else Esso Chad was going to terminate the contract. This $850,000 number that Esso Chad claimed Taylors was in arrears to its suppliers did not accurately reflect Taylors' accounts and was not based on information from Taylors' management. Taylors' Managing Director, Shabbir Ali, told Melvin that Taylors was not in a position to make such a large payment immediately, but Melvin continued to insist repeatedly that Esso Chad was demanding payment or Esso Chad would terminate the contract.

34. Finally, on December 17, 2003, Mr. Goodman again wrote to Esso Chad and pleaded for some retroactive financial relief to offset the $1.85 million in losses Taylors had sustained. The letter promised that any such relief would go to pay any amounts due its suppliers. In that letter, Taylors expressed concern that, without some relief, it faced the possibility of insolvency.

35. Esso Chad responded on December 19, 2003, by terminating the Catering Contract. Esso Chad purported to do so under the actual insolvency provision of the Catering Contract (§ 13.4).

36. The termination of the Catering Contract was the first time in the history of the Taylors family of companies, going back to 1937, that a customer had ever terminated a catering contract.

37. Immediately following Esso Chad's termination of the Catering Contract, Mr. Melvin revealed to Taylors that the catering services at the Project had been handed over to a joint venture called Senev-SSI, and that Melvin had been hired by them as their manager. Senev, one partner in the venture, was Taylors' principal local labor supplier from the inception of the

Catering Contract. The other partner in the venture was Greg Salangros, who was a longtime associate of Melvin's and had been hired by Melvin as his assistant prior to the termination of the Catering Contract. On information and belief, this disloyal action by Melvin was done with the knowing participation and encouragement of Esso Chad in the months leading up to the December termination.

38. It now appears, in light of the foregoing, that the additional billing done in the second half of 2003 was a deliberate pre-ordering by Mr. Melvin of food supplies for billing to Taylors, which food was to be delivered after the termination of the Catering Contract – i.e., after his taking over the business. In addition, it now appears that the extra services provided to Esso Chad, at Taylors' cost and without the knowledge of Taylors' management, were an attempt by Mr. Melvin to curry favor and support for his plan to usurp the Catering Contract.

39. Communications and other evidence known to Taylors indicates that Mr. Melvin and Esso Chad were both preparing for Mr. Melvin to take over the supply of catering services prior to the termination of the Catering Contract. These facts, together with the extensive pre-ordering of supplies indicate that Mr. Melvin intentionally worked to bring about the termination of the Catering Contract for his own interest, and against the interests of his employer, Taylors.

40. On information and belief, Esso Chad knew of and supported Mr. Melvin's plan to terminate the Catering Contract and actively abetted this plan.

41. The timing of the termination made it impossible for representatives of Taylors to travel to Chad for the purpose of securing its assets in Chad, including its records. This is because all visas for entry into Chad must be obtained at the Chadian Embassy in Paris, and the termination letter was delivered on the last business day before the Chadian Embassy closed until January 5 (for the Christmas holiday).

42. Despite Esso Chad's complete control of the Project site, Esso Chad told Taylors that it would not guarantee the safety of Taylors' representatives should they attempt to travel to Chad for the purpose of retrieving either its assets or its records. Indeed, it was intimated to Taylors that any such representatives attempting to visit the site would be in physical, potentially life-threatening danger. Also, Esso Chad under the Catering Contract had the obligation to marshal the property at the demobilization site, which it failed to do.

43. The book value of the assets that were confiscated by Esso Chad was $177,968. Per customary industry practice, if these assets had been purchased by the successor to the Catering Contract, the price would have been book value plus 10%, or approximately $195,000.

44. The value of the Taylors food supplies that were confiscated by Esso Chad was at least $517,592.23.

45. Esso Chad has never paid, nor offered to pay, for the assets it seized.

46. In addition, Taylors has submitted valid invoices to Esso Chad pursuant to § 10.1 of the Catering Contract for services provided prior to the termination of the contract. These invoices, totaling $975,972.29, have not been paid by Esso Chad.

47. When Taylors attempted to recover its records, it met with substantial resistance and difficulty. For example, after they had been grudgingly released by Esso Chad to Taylors' representative and then consigned to the courier service for shipment to Taylors' offices, Esso Chad seized the records back at gunpoint and kept them for months before finally returning them to Taylors.

48. On June 25, 2004, Esso Chad filed a complaint in the United States District Court for the Southern District of Texas. Esso Chad did not attempt to serve process on any of the defendants. Following the filing of the complaint, and without informing Taylors of the

complaint, Esso Chad invited Jon Murphy, General Manager of Taylors' office in Brighton, England, to travel to Houston, Texas for discussions purportedly aimed at resolving the parties' disputes. These talks were unsuccessful.

49. On July 30, 2004, Esso Chad amended its complaint and served process on the defendants. Esso Chad, contrary to well-established legal principles protecting corporate officers from individual liability, named Messrs. Goodman and Ali, the Chairman and Managing Director of Taylors, respectively, alleging they could be personally held liable under the Catering Contract. The Amended Complaint alleges that Esso Chad's assets were frozen by a Chadian court at the behest of Taylors' local suppliers, who claimed Taylors had not paid them. Esso Chad seeks damages alleged to flow from this freeze, including legal fees. However, according to correspondence from Esso Chad sent *before* Esso Chad filed its Amended Complaint, the freeze on Esso Chad's assets was dissolved by the Chadian court sometime in July 2004.

50. On September 23, 2004, Taylors intends to file motions to dismiss the Esso Chad complaint in its entirety on the grounds that Esso Chad agreed to arbitrate this dispute and, alternatively, that the Amended Complaint fails to state a claim upon which relief can be granted. The two individual defendants are likewise filing motions to dismiss for lack of personal jurisdiction, the agreement of the parties to arbitrate, and the Amended Complaint's failure to state a claim for which relief can be granted.

## FIRST CLAIM
## (BREACH OF CONTRACT)

51. Paragraphs 11 through 50 are incorporated herein by reference.

52. Taylors and Esso Chad entered into valid contract, namely, the Catering Contract.

53. Under § 10.1 of the Catering Contract, Esso Chad was obligated to pay all invoices within thirty days of receipt thereof.

54. Taylors has submitted valid invoices for services provided under the contract that remain unpaid beyond thirty days after their submission to Esso Chad.

55. Esso Chad has by its failure to pay breached the contract, and Taylors has been damaged by that breach in an amount to be determined but believed to total $975,972.29.

## SECOND CLAIM
## (CONVERSION/BREACH OF CONTRACT)

56. Paragraphs 11 through 55 are incorporated herein by reference.

57. Taylors was the legal owner of the inventory of food supplies and hard assets located at the Project site at the time of the termination of the Catering Contract.

58. By taking possession of these supplies and assets for its own use, Esso Chad exercised unauthorized and unlawful dominion over the assets owned by Taylors.

59. Taylors was damaged by this unlawful conversion (in violation of its contractual duties) in an amount to be determined, but believed to be approximately $700,000.

## THIRD CLAIM
## (BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING /
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

60. Paragraphs 11 through 59 are incorporated herein by reference.

61. Vince Melvin, as Taylors' on-site manager, was an agent of Taylors and owed Taylors a fiduciary duty of loyalty.

62. Esso Chad was aware of the fiduciary duty owed by Mr. Melvin to Taylors.

63. Mr. Melvin breached his fiduciary duties to Taylors by actively engineering the termination of the Catering Contract so that he could take over the business personally, and by taking other actions that were in his personal interest and against Taylors' interests, such as the rendering of extracontractual services to Esso Chad at Taylors' expense in order to curry personal favor with Esso Chad.

64. Esso Chad was aware of, supported, and abetted these breaches of fiduciary duty.

65. By its actions, Esso Chad breached the duty of good faith and fair dealing inherent in the Catering Contract.

66. Taylors has been damaged by Mr. Melvin's breach of fiduciary duty, and Esso Chad's aiding and abetting thereof, by the loss of its expectation interest in the remaining term of the Catering Contract, in an amount to be determined but believed to be approximately $800,000.

67. In addition, Esso Chad has been unjustly enriched by the extracontractual services which Mr. Melvin provided at Taylors' expense, in an amount to be determined at trial.

## PRAYER FOR RELIEF

68. Claimant Taylors seeks damages in an amount to be determined but believed to be at least $2.5 million, together with prejudgment interest and postjudgment interest as provided under New York law, costs and attorneys' fees, and any and all other relief which the Arbitral Tribunal deems just and proper.

## THE ARBITRATION

69. The agreement of the parties to arbitrate is found in § 18.1 of the Contract.

70. Section 18.1 does not specify the number of arbitrators to comprise the tribunal. Claimant believes that this dispute is not one "such as to warrant the appointment of three arbitrators" and thus requests the appointment of a sole arbitrator pursuant to ICC Rule of Arbitration 8.2.

71. Because Esso Chad is incorporated in the United States and has its principal place of business in the Republic of Chad, Claimant requests that Respondent be considered a national of both countries for purposes of ICC Rule of Arbitration 9.5. In addition, because Chad is a former colony of France, with which it still enjoys extremely close commercial and cultural ties,

Claimant requests that Esso Chad be considered a national of France as well for purposes of Rule 9.5.

72. Section 18.1 specifies that "the arbitrator(s) shall apply the laws of the State of New York of the United States of America, except for any rule of such laws which would make the law of any other jurisdiction applicable, and shall decide in accordance with the terms of this Agreement, taking into account the usage of the trade applicable to the transaction."

73. Section 18.1 further provides that "[t]he arbitration shall be held in the city of New York, State of New York of the United States of America and shall be conducted in English."

Dated:   New York, New York
         September 22, 2004

                              Respectfully Submitted,

                              ZUKERMAN GORE & BRANDEIS, LLP

                              By: _____
                                 John K. Crossman
                                 900 Third Avenue
                                 New York, New York 10022
                                 212.223.6700

                              *Attorneys for Taylors International Services Limited*