# EXHIBIT D

INTERNATIONAL COURT OF ARBITRATION OF THE
INTERNATIONAL CHAMBER OF COMMERCE

Arbitration No. 13 491/JNK

In the Matter of

TAYLORS INTERNATIONAL SERVICES LIMITED,
Claimant/Counter-Respondent

v.

ESSO EXPLORATION AND PRODUCTION CHAD INC.,
Respondent/Counter-Claimant

**Counterclaim And Answer Of
Esso Exploration And Production Chad Inc.**

30 November 2004

FULBRIGHT & JAWORSKI L.L.P.

Mr. Reagan M. Brown
Mr. David J. Levy
Mr. Charles Jason Rother
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
United States of America
Telephone: +1.713.651.5151
Facsimile:  +1.713.651.5246

## COUNTERCLAIM AND ANSWER OF
## ESSO EXPLORATION AND PRODUCTION CHAD INC.

**I.      INTRODUCTION**

1.      Esso Exploration and Production Chad Inc. ("Esso Chad") hereby submits its Answer and Counterclaim to the September 22, 2004, Request for Arbitration of Taylors International Services Limited. ("Taylors"), which was filed with the International Court of Arbitration of the International Chamber of Commerce ("ICC") on September 23, 2004.

2.      The parties' dispute arises out of and is in connection with a Catering and General Camp Services contract (the "Catering Contract") between Esso Chad and Taylors, dated October 1, 2001, and amended effective May 21, 2002 (Amendment Number 1), and July 10, 2002 (Amendment Number 2).

3.      Pursuant to the Catering Contract, Taylors agreed to provide catering and general camp services for Esso Chad employees, other workers, and camp residents at the Komé Base Drilling Camp in Komé, Republic of Chad, and at a Remote Drilling Camp near Komé.

4.      Esso Chad's counterclaims include breach of contract, indemnification, and breaches of the implied covenants of good faith and fair dealing.

5.      Esso Chad currently estimates its actual damages to exceed USD $4 million.  In addition, Esso Chad seeks all costs in connection with this arbitration, reasonable attorney's fees, and pre-award and post-award interest.

6.      Esso Chad is not liable to Taylors for any of the claims or damages asserted in Taylors' Request for Arbitration, because Taylors' own poor management, lack of oversight, and bad business decisions caused Taylors' alleged losses -- Esso Chad did not.

7.      Esso Chad reserves the right to supplement or amend its counterclaims, the amount of its damages claim, and its answer.

## II.    CONTACT DETAILS AND OTHER PARTICULARS

8.    Esso Chad is a corporation incorporated and recognized under the laws of the

State of Delaware, United States of America, with a registered address at:

> Esso Exploration and Production Chad Inc.
> 16945 Northchase Drive, 8th Floor
> Houston, Texas  77060
> United State of America

9.    Esso Chad is an affiliate of Exxon Mobil Corporation ("ExxonMobil"), a New

Jersey corporation with its corporate headquarters in Irving, Texas, U.S.A.

10.    Esso Chad is represented in this arbitration by:

> Mr. Reagan M. Brown
> Mr. David J. Levy
> Mr. Charles Jason Rother
> Fulbright & Jaworski L.L.P.
> 1301 McKinney, Suite 5100
> Houston, Texas 77010
> United States of America
> Telephone:  +1.713.651.5151
> Facsimile:  +1.713.651.5246

## III.    THE ARBITRATION AGREEMENT AND APPLICABLE LAW

### A.    The Dispute Resolution Provisions.

11.    Section 18.1 of the Catering Contract provides as follows:

> Any controversies or claims between the parties hereto arising out
> of or relating to this Agreement or the breach thereof may, at the
> election of [Esso Chad] or [Taylors], be settled by arbitration in
> accordance with the commercial rules of the International Chamber
> of Commerce, and judgment upon the award rendered by the
> arbitrator(s) may be entered in any court having jurisdiction
> thereof.  In determining the substance of such controversy or
> claim, the arbitrator(s) shall apply the laws of the State of New
> York of the United States of America, except for any rule of such
> laws which would make the law of any other jurisdiction
> applicable, and shall be decided in accordance with the terms of
> this Agreement, taking into account the usage of the trade
> applicable to the transaction.  The arbitration shall be held in the
> city of New York, State of New York of the United States of

3

America and shall be conducted in English.  Neither the existence of any controversy or claim nor the fact that arbitration is pending hereunder will relieve either party hereto of its obligations under this Agreement.

12.     This arbitration was filed by Taylors on September 23, 2004.

**B.      Number of Arbitrators.**

13.     Esso Chad does not object to the appointment of one arbitrator to decide the matters to be arbitrated.  The Catering Contract requires the arbitrator to conduct the arbitration in English and apply American law.  (*See* Catering Contract at §§ 18.1-18.2.)  Accordingly, Esso Chad believes that in order to be qualified under Article 9(1) of the ICC Rules of Arbitration, the sole arbitrator should be fluent in English and have experience and knowledge of American law.

**C.      Nationality Of Parties.**

14.     For purposes of Section 9.5 of the ICC Rules of Arbitration, Esso Chad admits (for the limited purpose of this arbitration) that it may be considered to be both Chadian and American.  Additionally, while Esso Chad denies that it is a citizen of France or is connected to France in any significant manner, it does not object to the exclusion of a French national from being considered as the sole arbitrator in this matter.  (*Compare* Request for Arbitration at ¶ 71, pp. 14-15, arguing that Esso Chad should be considered a French national.)

15.     Taylors is a national of the United Kingdom.  H.N.A. "Sandy" Goodman, a principal of Taylors and a person whom Esso Chad contends should be a party to this arbitration, is believed to be a national of the United Kingdom.  Shabbir Ali, another principal of Taylors and another person whom Esso Chad contends should be a party to this arbitration, is believed to be a national of the United Kingdom, Saudi Arabia, Pakistan and/or the United States.

**D.      Request for Hearing.**

16.      Pursuant to Sections 20.2 and 20.6 of the ICC Rules of Arbitration, Esso Chad requests a hearing before the Arbitral Tribunal in order to establish the facts of this matter. Pursuant to Section 20.3 of the ICC Rules of Arbitration, Esso Chad also requests that such hearings include testimony from witnesses, including expert witnesses.

**E.      The Substantive Applicable Law.**

17.      Section 18.2 of the Catering Contract state, "[t]he validity, interpretation, and implementation of this Agreement shall be governed by the laws of New York."  Esso Chad asserts, however, that Texas law may apply to certain claims it asserts in this proceeding based upon the proper choice-of-law analysis.

## IV.      OVERVIEW OF FACTS

18.      Within months after its execution of a three-year contract to provide catering and general services to Esso Chad in Chad, Taylors engaged in what became a pattern of poor management, lack of oversight, and bad business decisions.  The result of this mismanagement was that Esso Chad was sued in multiple lawsuits in Chad by Taylors' unpaid subcontractors. One of those lawsuits resulted in a USD $3 million account freeze order from a Chadian court to "secure" the unpaid amounts.  Taylors now seeks to escape responsibility for its breaches of contractual and common law duties by blaming its operational failures on its own employees, international currency exchange rates, and the company that subsequently took over the catering services for Esso Chad.  Taylors further seeks to require Esso Chad to pay Taylors for the alleged losses that Taylors sustained as a result of its flawed business operations.  For the reasons outlined below, Esso Chad, not Taylors, is entitled to a recovery of damages in this matter.

## V.   ESSENTIAL FACTS

### A.   Esso Chad Needed a Catering/Services Provider to Assist With the Chad Cameroon Development Project.

19.   Starting in late-2000, Esso Chad (along with other oil companies) and a workforce of as many as 11,000 people have been developing the oil fields in southern Chad and building the 1,070-kilometer pipeline to the coast of Cameroon needed to export Chad's crude oil to world markets.  The project is known as the Chad Cameroon Development Project (the "Project").  (*See* Chad Cameroon Development Project Fact Sheet 2001, attached as Exhibit 1.) To staff the Project, Esso Chad established the Komé Base Drilling Camp in Komé, Chad, as well as an itinerant Remote Drilling Camp near Komé (collectively the "Komé Camps").

20.   Because work on the Project would continue for many years, arrangements had to be made to feed and house the Esso Chad employees and other workers involved with the Project.  Esso Chad therefore attempted to solicit bids from companies having experience and expertise in providing catering and general camp services for large groups working for an extended time in an international, remote setting.

21.   In late-August 2001, Esso Chad initiated a competitive, sealed bidding tender process for a contract to provide catering and general camp services for the Komé Camps.  (*See* Esso Chad Catering and General Camp Services Invitation to Tender, attached as Exhibit 2.)  At that time, a proposed principal agreement was issued to various bidders for review/comment. (*Id.*)  All bidders were given the opportunity to ask questions, request clarifications, object to terms and conditions of the principal agreement, offer substitute language for consideration by Esso Chad, and pursue any other negotiation protocols.  (*Id.*)  The bidders had two weeks to prepare their bids and submit any questions or negotiation points to Esso Chad.  (*Id.*)

**B.     Taylors' Accepted Esso Chad's Tendered Principal Agreement Without Comment or Objection.**

22.     On August 30, 2001, Esso Chad received written notice from Mr. Glen Beal, Vice President of Business Development for Taylors, that Taylors intended to submit a bid quote for the proposed contract.[1]  (*See* August 30, 2001, Returned Invitation to Tender from Mr. Glen Beal, attached as Exhibit 3.)  Taylors – like the other bidders – had from August 31, 2001, to September 15, 2001, to ask any questions, request meetings for clarifications or negotiations, make objections, or advise Esso Chad if any part of the principal agreement that was of concern to Taylors.  Nevertheless, Taylors did not object, request clarification, or advise Esso Chad of any portions of the Catering Contract that presented issues for Taylors.

23.     Rather, Taylors accepted the terms of Esso Chad's tendered principal agreement without any discussion or negotiation.[2]  On or about September 13, 2001, Taylors submitted its bid proposal for the proposed catering and camp services contract.  (*See* Taylors' Catering and General Camp Services Tender, attached as Exhibit 4.)  Thus, for example, Taylors agreed to be paid by Esso Chad in U.S. Dollars, and to pay for its labor and supplies in the national currency of Chad, which was tied to the European Union's Euro.[3]

---

[1] In its Request for Arbitration, Taylors – in an apparent attempt to intimate some collusive relationship – describes Mr. Glen Beal as a "longtime associate" of Mr. Dan Deer, an Esso Chad contractor involved with the bid tender process and execution of the Catering Contract.  (*See* Request for Arbitration at ¶ 14, p. 5.)  This description is exaggerated and false.  Mr. Deer met Mr. Beal for the <u>first</u> time during the bid tender process for the Catering Contract.  Mr. Deer has known of Mr. Beal since that time; however, they have never enjoyed any "association" or ongoing relationship.

[2] For example, Taylors did not question Esso Chad regarding the encouraged use of Chadian personnel.  (*See* Catering Contract § 3.2, requesting Taylors to give priority to use of Chadian personnel under certain circumstances).  Indeed, Taylors most likely perceived this request as beneficial and as being more cost effective.

[3] As noted in the Taylor's Request for Arbitration, the national currency of Chad – the Communaute Financiere Africaine franc (CFA) – is tied to the European Union's Euro and its strength can be gauged by comparison with the Euro.  (*See* Request for Arbitration at ¶ 22, p. 6.)  For historical currency rates see http://www.iccfx.com.

24.     On September 13, 2001, the U.S. dollar was strong relative to Chad's currency (.916 USD = 1 EUR).[4]  Accordingly, Taylors was set to be compensated in a strong currency (USD) and purchase less expensive labor/supplies in the weaker, local Chadian currency. Taylors was responsible, however, for managing its own currency fluctuation risks – a known risk in the industry, and one that is usually monitored and hedged by service providers such as Taylors.

**C.      Taylors' Made Multiple Representations Regarding Its Abilities In Order To Obtain the Catering Contract.**

25.     In connection with Taylors' bid proposal, Taylors made the following express written representations regarding the catering and camp services it would provide if awarded the contract:

- "Taylors International is confident in its ability to provide (Esso Chad) quality services at the Chad Drilling and Completion Project;"

- "Taylors provides superior goods and services to all of our clients by using top quality products at the best market price and providing a highly experienced and professional management team;"

- "Taylors International makes a significant contribution to the local economies in the areas we operate, which in turn, creates positive goodwill for the customer's project;"

- "[Taylors] will be able to mobilize quickly upon notification of award.  Our experience provides us with knowledge of qualified personnel, vendors and other resources that can be drawn upon during mobilization;"

- "Taylors makes it a priority to maintain a high level of service throughout the length of our contracts.  Through continual training efforts great progress has been made in terms of high quality of services and products."

(*See* Exhibit 4, Taylors' Catering and General Camp Services Tender.)

---

[4] *See* http://www.iccfx.com.

26.     Additionally, at the time of its bid proposal, Taylors represented, in written brochures and through its website, the nature and extent of its experience and expertise in providing catering and general camp services for international work.   The additional representations included:

- "Over the years we have developed and expanded our capabilities and now provide a comprehensive range of support services to a wide variety of clients from small private companies to large multinationals and Governments in different, and in some instances, remote parts of the world;"

- "Massive labor forces, difficult situations, awkward locations, none of these has stopped Taylors International from supplying the right materials to the right people . . . right on time;"

- "Taylors International initially gained its vast experience feeding and housing a sizeable part of the onshore workforce of Britain's then developing North Sea oilfields.  In 1975, we began to build on this expertise in the Middle East.  Here, Taylors International soon became highly skilled in catering for multi-national work forces;"

- "With our bulk buying, together with the quantities of meals we supply, we might be competitive in our pricing but are uncompromising in our quality.  We design complete or partial packages according to your needs, status or location;"

- "We can also provide 'instant' housing.  Designed to fit your needs, these houses can be set up and located almost anywhere.  The buildings can be used for work camps, living accommodations, offices, clinics, showrooms, restaurants, beach houses, laundries, toilet units and residential villas, to name a few of the vast range of possibilities."

(*See* Taylors' Website Material, attached as Exhibit 5.)

**D.     Esso Chad and Taylors Entered Into The Catering Contract.**

27.     After reviewing and analyzing the various bid proposals from various entities who submitted bids in this competitive, sealed bidding process, Esso Chad awarded the contract to Taylors based upon the various representations contained within Taylors' bid.

28.     Thus, on October 1, 2001, Esso Chad and Taylors entered into Contract Number CDPF-050 (56045) for Catering and General Camp Services (the "Catering Contract").  (*See* Catering Contact, attached as Exhibit 6.)

29.     The Catering Contract required Taylors to provide catering and general camp services for Esso Chad employees and other workers in the Komé Camps, with the catering and general camp services to be provided at a specified, per person, per day contract rate.  (*See* Exhibit 6, Catering Contract at Exhibit A (Scope of Work) and Exhibit C (Rates, Prices, and Staffing).)  The initial contract term was for three years, with a total estimated value of USD $5.2 million.  (*Id.* at § 13.1 (Term of Agreement).)

30.     Under the Catering Contract, Taylors agreed to perform all of the services defined in the Scope of Work section of the Catering Contract and, among other things:

- Take no action in the rendition of services under the contract that would subject either Taylors or Esso Chad to any liability.  (Section 16.2.);

- Be fully and solely responsible for the payment of all labor and materials used by Taylors in connection with providing the catering and related services to Esso Chad.  (Section 10.4.);

- Exercise reasonable care and diligence to prevent any actions or conditions which could result in a conflict with Esso Chad's best interests.  (Section 16.1);

- Indemnify and defend Esso Chad from and against "any and all claims, demands, judgment and causes of action made, raised or asserted by any party for... loss, damage or destruction of... any property owned, borrowed or rented by [Taylors or its affiliates or subcontractors] ... regardless of whether such loss, damage or destruction is caused by the fault, negligence or breach of [Esso Chad or its affiliates]."  (Section 5.1(c).)  This indemnification responsibility extended to Taylors affiliates, officers, agents, employees and representatives. (Section 5.1);

- Indemnify and defend Esso Chad from and against any and all claims, demands, judgments and causes of action made, raised or asserted by any party for . . . failure of... (Taylors)... Group to pay any of the... assessments . . . fees and charges referred to in subsection 7.1." (Section 5.1 (e)).  Under Section 7.1 of the Catering Contract, Taylors was obligated to

"be responsible for and shall pay all . . . fees and charges assessed or levied by the Country of Operations or any political subdivision thereof . . . against (Esso Chad) for or on account of any payment made to or earned by (Taylors) or any Contractor or Subcontractor of (Taylors) in connection with the Work . . ." Again, this indemnification responsibility extended to Taylors affiliates, officers, agents, employees and representatives. (Section 5.1); and,

- Indemnify Esso Chad against Taylors' failure to establish an office in Chad and appoint a tax representative (Section 5.1(d)).

(*Id.* at Scope of Work Section.)

### E.   Taylors Hired Mr. Vince Melvin and Then Failed To Support the Chadian Operations.

31.     Taylors recruited and hired Mr. Vince Melvin as its on-site manager.  Esso Chad was in no way involved with the retention of Mr. Melvin and was in no way responsible for his acts and/or omissions in his role as an employee of Taylors.  Upon information and belief, Mr. Melvin reported directly to Mr. Shabbir Ali ("Ali") (the Managing Director and part owner of Taylors) during the critical times in the management of Taylors' services at the Komé Camps. At no point did Taylors request that it be allowed to place additional Taylors management personnel at the Komé Camps to exercise "close scrutiny of the actions of [Melvin]."  (*Compare* Request for Arbitration at ¶ 5, p. 2.)

32.     Rather, Taylors' connection to and support of Mr. Melvin and the Komé Camps was inadequate given the task at hand.  After continued lack of support by Taylors, Mr. Melvin attempted to resign from Taylors several months prior to the termination of the Catering Contract.  (*See* June 11, 2003, Email Correspondence from Mark Clawson to Mr. Dan Deer, attached as Exhibit 7.)  Only after repeated reassurances from Taylors did he remain in Chad. Even then, Mr. Melvin was absent for long periods of time.  During those times, Taylors did not provide a replacement for Mr. Melvin – leaving the operations (including the purchase of goods

and services) to be run by Mr. Raja Dopalan.[5]  Mr. Melvin eventually resigned from Taylors because Taylors failed to pay him, continually failed to provide the necessary support in Chad, and failed to provide Mr. Melvin with funds to pay Taylors' suppliers – even though the contract was apparently generating sufficient revenue to at least cover its expenses.

**F.      From The Beginning, Taylors Experienced Financial Difficulties Due To Management Problems.**

33.      Within a few months after the Catering Contract was executed, problems began to develop regarding payments Taylors was suppose to make to its contractors, subcontractors and local suppliers.  On April 16, 2002, only six months into the contract, Taylors asked Esso Chad to amend the Catering Contract to increase the per person compensation rate.  (*See* April 16, 2002, Correspondence from Mr. Vince Melvin to Mr. Dan Deer, attached as Exhibit 9.)

34.      Taylors' request was not based upon issues with fluctuating currency.  Indeed, between October 1, 2001, and May 1, 2002, the U.S. dollar maintained a strong position relative to the Euro (and, in turn, the local Chadian currency).[6]  Taylors – based upon this favorable exchange rate – should have been profiting from the Catering Contract during this time period.  Rather, the request was necessary due to Taylors' poor management decisions, inability to accurately forecast/plan, and lack of regional experience.  This, of course, was contrary to Taylors' representations that it was an experienced international company with an ability to handle "difficult situations" and "awkward locations" all over the world.  (*See* Exhibit 5, Taylors' Website Material.)

---

[5]  As with Mr. Melvin, Mr. Dopalan eventually resigned due to lack of support from Taylors and the continued threats of physical violence and death he received due to Taylors' failure to pay its suppliers.  (*See* December 19, 2003, Email Correspondence from Mr. Raja Gopalan to Mr. Shabbir Ali, attached as Exhibit 8.)

[6]  During this time period, the U.S. dollar was at its weakest against the Euro on October 3, 2001 – days after the Catering Contract was entered (.9184 USD = 1 EUR) and was, on average, strong against the Euro (the average exchange rate during that time period was 0.8863 USD = 1 EUR).  *See* http://www.iccfx.com.

35.    Nevertheless, on May 21, 2002, Esso Chad – in an effort to maintain a continuing supply of catering and general camp services to its employees and other workers – agreed to raise the per person compensation rate.  (*See* April 25, 2002, Email Correspondence from Mr. Dan Deer to Mr. Vince Melvin, attached as Exhibit 10; *see also* May 21, 2002, Amendment Number 001 to Catering Contract, attached as Exhibit 11.)

36.    Specifically, Esso Chad agreed to raise the per person rates 25%.[7] (*Id.*)  With this increase, and based on a camp population of approximately 1,000 individuals at a time (consisting of 50% Expatriates/Third Country Nationals ("TCNs") and 50% Chadian Nationals), Taylors' total billing for catering services was approximately USD $13,000 per day, USD $410,000 per month, and USD $4,900,000 per year.  Esso Chad was confident that this amount of revenue was more than sufficient to allow a prudently managed business to perform the duties required under the Catering Contract.

**G.    Taylors' Services Were Not "Quality Services."[8]**

37.    In addition to its financial and management difficulties, various performance issues soon arose regarding Taylors' services, including the following issues:

- Short sleeve uniforms were provided when camp regulations required long sleeves as part of a Malaria Prevention Program;

- Immediate cash flow problems requiring special handling of invoices to facilitate and expedite payments;

- Gasoline powered vehicles were supplied instead of diesel powered vehicles;

- Rig meals arrived cold and late, and other food supplied by Taylors was of poor quality;

- Taylors kept poor and ineffective business records; and,

---

[7]  The increase raised the per day rate for Expatriates/TCNs from $16.50 to $20.63, and the per day rate for Chadian Nationals from $5.50 to 6.88.  (*See* Exhibit 11, May 21, 2002, Amendment Number 001 to Catering Contract.)

[8]  *Compare* Request for Arbitration at ¶ 21, p. 6.

- Taylors failed to hire a full-time, on-site financial accountant (until October 2003, two months prior to termination).

38.     The failure to provide diesel powered vehicles was a basic and costly oversight – exhibiting a clear lack of experience regarding the region.  There is very little gasoline available in Chad and none available in or near the Komé Camps.  In addition to the required purchase of replacement vehicles, the gasoline vehicles were sold at a substantial loss.

39.     Importantly, Taylors continually failed to place an accountant at the Komé Camps – doing so only two months prior to the termination of the Catering Contract and only after yielding to continued requests of Esso Chad.  (*See* August 1, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Dan Deer, attached as Exhibit 12.)

40.     Even then, the accountant's tenure was short lived.  The accountant hired by Taylors, Richard Lafond, quit because of the lack of funds provided by Taylors to meet agreements Taylors made with its suppliers and the fact that Taylors' management continued to divert money out of payments made by Esso Chad rather than use those funds to pay Taylors' suppliers.  (*See* November 18, 2003, Email Correspondence from Mr. Richard Lafond to Mr. Shabbir Ali; November 28, 2003, Email Correspondence from Mr. Richard Lafond to Mr. Shabbir Ali; December 1, 2003, Email Correspondence from Mr. Richard Lafond to Mr. Shabbir Ali, collectively attached as Exhibit 13.)

41.     Without an on-site accountant during a majority of the term of the Catering Contract, Taylors was unable to correctly invoice for its services, monitor the timing/amounts of food being ordered, account for the number of individuals in the camps, or provide support for the amounts paid (and unpaid) to Taylors' subcontractors and suppliers.

42.  Indeed, in its continued attempt to help Taylors, Esso Chad employees returned improper invoices submitted by Taylors where Taylors had shorted themselves by failing to keep proper "head counts" of the individuals in the Komé Camps.  Additionally, the local Esso Chad accountant and other Esso Chad employees worked with Taylors to present properly supported invoices to allow Taylors to recover hundreds of thousands of dollars from Esso Chad under the Catering Contract.

43.  In June 2002, Esso Chad conducted an audit of Taylors' activities and found various deficiencies related to Taylors' scope of work and compliance with contractual requirements.  (*See* June 2002 Audit, attached as Exhibit 14.)  This audit revealed that Taylors either lacked the understanding of (or maintained a clear disregard for) the scope of work and requirements under the Catering Contract.

44.  The lack of compliance with Catering Contract requirements noted during the audit included the following items:

- Meat transported in non-refrigerated vehicles or sealed packages;

- Fish transported for eight hours in non-refrigerated vehicles;

- No properly calibrated thermometers used to measure food temperatures;

- No cold food holding equipment present;

- No disposable towels present in entire camp;

- Presence of stagnant, putrid water outside dried food storage, tracked into kitchen and food serving areas;

- Non-functioning wash sinks in kitchen, which were non-existent for first six months of the operations;

- People in soiled work clothes allowed into dining hall;

- Dining tables not consistently sanitized between use;

- Food rotting under steps into junior mess hall;

15

- No single service spoons in camp;

- No monthly and/or quarterly medical examinations of Taylors' personnel performed;

- No copies of Esso Chad manuals (General Project Specifications for Catering Services and Health Inspection Guidelines for Upstream Operations) available to Taylors' employees to ensure compliance;

- Aprons for food personnel being worn outside of food preparation areas;

- Smoking by Taylors' food handling personnel while on duty;

- Soap for hand wash sinks within galley not always available and paper towels not available;

- Toilet facilities adjacent to mess hall not maintained in sanitary condition;

- Taylors could not produce required inspection records/logs;

- Refrigerator temperatures not recorded on log each shift;

- Refrigerator external thermometers not present;

- Expiration dates on foods not current, with some dates on food dating back to November, 2001;

- Freezer temperature not maintained at adequate temperatures;

- No dates recorded on frozen foods;

- Meat not stored in tightly wrapped moisture proof materials; and,

- Taylors' not using a two door system to enter dining hall to keep dining areas free of flies, insects, and pests.

(*Id.*)  All in all, of the 55 contractual requirements reviewed during the audit, Taylors failed to meet 40 of them – showing a failure to provide adequate Safety, Health and Environmental oversight due to lack of knowledgeable personnel and inadequate procedures.  (*Id.*)  In order to address and alleviate the deficiencies, it was necessary for Esso Chad's employees to maintain constant supervision and monitoring of Taylors to ensure contract compliance.

16

**H.      Despite Esso Chad's Rate Increase and Supervision, Taylors' Difficulties Continued Due To Taylors' Assumed Currency Risk and Management Incompetence.**

45.      Following the May 2002 rate increase, Esso Chad believed that the financial problems with Taylors being able to pay Taylors' contractors, subcontractors and local suppliers had been resolved.  In June 2003, however, Esso Chad learned that Taylors' financial problems had resurfaced, and were more significant than at the time Taylors requested its original rate increase to the Catering Contract.  Esso Chad began to receive complaints and information regarding suppliers not receiving payments from Taylors.   (*See* June 9, 2003, Email Correspondence from Mr. Don Norland to Mr. Miles Shaw, attached as Exhibit 15.)

46.      According to Taylors, it was being "squeezed by the weakening dollar." (Request for Arbitration at ¶ 25, p. 7.)  This "squeeze," however, was not sudden – Taylors, in fact, admits that the Euro had been "experiencing a steady rise against the dollar beginning in early 2002 and continuing through the end of 2003." (*Id.*, at ¶ 22, p. 6.)  As an experienced international company, Taylors understood the dynamics of international finance, but chose not to hedge against the strength of the Euro (and, in turn, the CFA) in the second year of the Catering Contract – a practice routinely executed by international companies.

47.      Additionally, the financial difficulties experienced by Taylors in Chad (in the form of inability to pay its contractors, subcontractors and local suppliers) were exacerbated by management incompetence.  Taylors was not using 100% of the revenues generated under the Catering Contract for its operations in Chad. (*See, e.g.* Exhibit 13, Email Correspondence from Mr. Richard Lafond to Mr. Shabbir Ali).  Rather, Taylors' management and owners deliberately diverted those revenues to (a) other Taylors projects (*e.g.*, Yemen Hunt Oil and BP Sakhalin Parker) and (b) themselves.

48.     Additionally, Taylors' services continued to fail to meet various contractual requirements and standards.  During this time, Taylors' hired a Site Manager, Mr. Graham Sanderson.  However, he was subsequently fired because of his total lack of compliance with contractual and audit requirements.

49.     These issues forced Esso Chad to contemplate termination of the Catering Contract and to communicate its concerns to Taylors.  (*See* Exhibit 7, June 11, 2003, Email Correspondence from Mr. Dan Deer to Taylors.)

**I.     Esso Chad Did Not Require Taylors To Use Chadian Suppliers/Personnel.**

50.     Taylors also blames its financial difficulties on the "requirement" that it use Chadian "labor and suppliers as much as possible." (*See* Request for Arbitration at ¶ 18, p. 5; citing Catering Contract at § 3.2.)  While Esso Chad, as part of the Chad Socio-Economic Development Program, encouraged its contractors to use Chadian National personnel on their staff and use local Chadian businesses when feasible (*i.e.*, when quality, content and fit for purpose was not compromised) – it did not *require* Taylors to use Chadian suppliers.  The Catering Contract reads, in pertinent part (emphasis added):

> CONTRACTOR shall give priority to the use of local Chadian personnel, equipment, materials, and services available in Chad as well as the services of contractors and insurers established in the Republic of Chad, *provided, however such personnel, equipment, materials and services meet the criteria of efficiency, technical capabilities **and financial considerations*** and are comparable to personnel, equipment, materials, and services of foreign origin with regard to quality, price, reliability, delivery terms and availability at the time and in the quantities required.

(*See* Exhibit 6, Catering Contract at § 3.2.)

51.     The "financial consideration" exception within the Catering Contract regarding the use of Chadian resources was specifically designed to fit Taylors' alleged situation regarding the currency shift.  Nevertheless, Taylors continually chose to use local suppliers.

52.    In actuality, Taylors' use of Chadian resources was not because of any strict mandate enforced by Esso Chad, but because non-Chadian suppliers required (1) advance payment, (2) bank guarantees, (3) letters of credit, and/or (4) short, 30-day payment terms. Taylors either chose not to deal with these non-Chadian requirements or did not have the financial strength or resources to meet the requirements.   Either way, Esso Chad was not to blame.

**J.     Based On Taylors' Continued Issues, Regular Conference Calls Were Initiated.**

53.    Based   upon   continued   complaints   to   Esso   Chad   from   Taylors' subcontractors/suppliers regarding lack of payments and Taylors' financial difficulties, Esso Chad and Taylors began to conduct weekly, then bi-weekly, conference calls.   During those calls, Taylors ensured Esso Chad of its commitment and it plan to remedy the issues, and submitted unsupported correspondence alleging anticipated and executed payments to suppliers. (*See* June 18, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Dan Deer; June 24, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Dan Deer; June 24, 2003, Email Correspondence from Mr. Vince Melvin to Mr. Dan Deer; July 2, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Dan Deer; July 4, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Chuck Roberts, attached collectively as Exhibit 16.)

54.    Also during those conference calls, Esso Chad mentioned various options that Taylors may wish to pursue in order to alleviate Taylors' troubles.   Those options included seeking a possible hardship claim and/or currency exchange adjustment from ExxonMobil. However, neither of these options was guaranteed under the Catering Contract, or was suggested with any degree of certainty by Esso Chad that they would be accepted, and they were always offered subject to the evaluation of ExxonMobil.

**K.    Taylors Sought A Second Rate Increase From Esso Chad.**

55.    On July 2, 2003, Mr. H.N.A. "Sandy" Goodman ("Goodman"), the Chairman and part-owner of Taylors, wrote to Esso Chad regarding Taylors' financial problems in making payments to its contractors, subcontractors and local suppliers.    (*See* July 2, 2003, Correspondence from Mr. H.N.A. Goodman to Mr. Dan Deer, attached as Exhibit 17.) Goodman requested that Esso Chad make a hardship payment to cover the unpaid amounts Taylors owed. (*Id.*) Esso Chad requested that Taylors provide certain information to support the request.    (*See* Exhibit 16, Email Correspondence from Mr. Dan Deer to Mr. Shabbir Ali.) However, because Taylors could not provide various information or a full and accurate accounting of the amounts Taylors owed, Esso Chad declined to make any "hardship payment" – a payment that Esso Chad had no obligation to make under the Catering Contract.

**L.    Esso Chad Continued To Attempt To Help, But To No Avail.**

56.    Over the next several months, Esso Chad worked extensively with Taylors to address Taylors' financial problems in its dealings with Taylors' contractors, subcontractors and local suppliers.   Despite Esso Chad's efforts, Taylors' financial problems only became worse over the course of 2003.  For example, in October 2003, Taylors represented that the outstanding claims of its contractors, subcontractors and local suppliers amounted to approximately USD $500,000.00. (*See* October 17, 2003, Email Correspondence from Mr. Raja Seshardi, attached as Exhibit 18.)  Less than one month later, however, Taylors represented that these outstanding claims were in fact in the range of USD $3 million.

57.    During late-2003, Taylors' suppliers continually approached Esso Chad due to several months of Taylors' failing to submit payments, and threatened to no longer provide food or materials.  Additionally, payments were not being made by Taylors to its employees and items were not being procured by Taylors for the camp maintenance department (causing delays in

maintenance work).  These concerns were continually passed along to Taylors.  (*See, e.g,* December 10, 2003, Email Correspondence from Mr. Garry Marshall to Mr. Shabbir Ali, attached as Exhibit 19.)

58.    As part of its continuing efforts to maintain continuity with the catering and general camp services, Esso Chad agreed to consider providing Taylors with a per person rate increase under the Catering Contract, with said rate increase to be effective December 1, 2003.

**M.    Taylors' Confirmed Inability To Provide Services, Pending Insolvency, and Requested Termination of The Catering Contract.**

59.    On or about December 15, 2003 – prior to the anticipated rate increase – Taylors wrote Esso Chad to state that Taylors was "no longer in a position to fulfill [its] contractual obligations with respect to [its] supplier payments." (*See* December 15, 2003, Correspondence from Mr. Vince Melvin to Mr. Mark Clawson, attached as Exhibit 20.)  Taylors stated that in order for it to continue operating under the Catering Contract, Esso Chad would have to make any rate increase retroactive to August 1, 2003 – amounting to an additional payment to Taylors of approximately USD $1,850,000. (*Id.*)

60.    On or about December 17, 2003, Goodman wrote to Esso Chad and stated that without the payment of the USD $1,850,000, Taylors was in danger of insolvency and had no option but to ask Esso Chad to terminate the contract. (*See* December 17, 2003, Correspondence from Mr. H.N.A. Goodman to Esso Chad, attached as Exhibit 21.)

> We find that without compensation for the previous losses this contract is causing such a strain on our finances that we will be in danger of becoming insolvent.  If therefore you still feel unable to compensate us for the losses incurred of U.S. $1.85 million then we have no option but to ask you to terminate the contract with immediate effect, when we would be willing to continue to provide the services at your cost.

(*Id.*)

21

**N.      Esso Chad Terminated The Catering Contract Pursuant To Taylors' Request, But Taylors' Obligations Continued.**

61.      On December 19, 2003, Esso Chad terminated the Catering Contract with Taylors based upon (1) Taylors' request; (2) the representation of insolvency if the non-obligatory retroactive rate increase request and/or payment of USD $1,850,000, was not granted; and (3) the continued failures of Taylors to fulfill its obligations under the Catering Contract to pay Taylors' contractors, subcontractors and local suppliers. (*See* December 19, 2003, Correspondence from Mr. Mark Clawson to Mr. H.N.A. Goodman and Mr. Shabbir Ali, attached as Exhibit 22.)

62.      Importantly, and as noted in Esso Chad's termination correspondence, under Section 10.4 of the Catering Contract, Taylors remained obligated and responsible to pay all debts owed to Taylors' contractors, subcontractors and suppliers. (*Id.*) Taylors further remained obligated under Section 5.1 of the Catering Contract to indemnify Esso Chad for any claims, demands, causes of action or judgments causing any assessments, fees or charges to Esso Chad for the matters covered under Section 5.1.

**O.      Taylors' Unpaid Subcontractors Flooded Esso Chad With Demands.**

63.      Shortly after the Catering Contract was terminated, Esso Chad began receiving demands from Taylors' contractors, subcontractors and local suppliers for payments of the amounts earned by those entities in providing services on behalf of Taylors as part of Taylors' contractual obligations under the Catering Contract. (*See, e.g.,* January 6, 2004, Correspondence from Mr. France Chachati to Mr. Dan Deer, attached as Exhibit 23.) Esso Chad demanded that Taylors fulfill its continuing contractual obligations under Section 10.4 of the Catering Contract to resolve these outstanding claims; however, Taylors continually failed to do so.

**P.      In Order to Continue Camp Operations, Esso Chad Entered Into An Agreement With Senev SSI To Supply Food and Camp Services.**

64.     Following the termination of the Taylors' Catering Contract, Esso Chad was in urgent need of a services contractor to supply catering and general camp services for the Komé Camps. Esso Chad had considered two different companies for this work – CIS and Senev SSI. Esso Chad entered into a services contract with the joint venture, Senev SSI, to enable the 1,000 person camp to continue to function.  Senev SSI had previous catering experience and was licensed for handling catering operations in Chad.  Esso Chad was not confident that CIS could provide the services necessary on short notice and it was clear that the Komé Camps (with five operating oil rigs and 1,000 workers) were in dire need of a service provider to feed the workers, wash the clothes, perform the maintenance, and maintain hygiene in the camps.

65.     At that time, Esso Chad was aware that Mr. Melvin was speaking with Senev SSI regarding potential employment and/or a partnership; however, upon information and belief, Mr. Melvin and Senev SSI never reached an agreement upon partnership and Mr. Melvin eventually left the Komé Camps.  At no time was Esso Chad aware of any of Mr. Melvin's allegedly improper acts or omissions regarding his work for Taylors.[9]

**Q.      Taylors Abandoned Its Property, and Senev SSI Used The Food Inventory.**

66.     Following the termination of the Catering Contract, Esso Chad did nothing to prevent Taylors from collecting its property.  Rather, it appears that lack of planning and poor management resulted in Taylors simply abandoning it for a period of time.  The timing of the termination was in no way connected to any attempt by Esso Chad to hinder Taylors from collecting its property.

---

[9]  Mr. Melvin subsequently obtained employment with Senev SSI, which employment was terminated on or about February 2004.

67.     Indeed, the fact that Taylors employees could not enter Chad until following the Christmas holidays is yet another case of poor management by Taylors – it is standard practice among international businesses operating in Chad to ensure that employees/management maintain multi-entry visas that allow the individuals to forego obtaining a visa for each individual entry into Chad.  Had Taylors followed this practice, it would have had the ability to collect its property in a timely fashion.

68.     The food inventory at the camps (or that arrived pursuant to orders placed by Taylors prior to termination) was not held by Esso Chad.  Rather, it was used by Senev SSI to provide meals for the 1,000 camp residents at the Komé Camps.  Taylors was fully aware that Senev SSI had assumed the food inventory.  (*See* January 22, 1004, Email Correspondence from Mr. Jon Murphy to Mr. Dan Deer, attached as Exhibit 24.)  Additionally, upon information and belief, Senev SSI (a subcontractor of Taylors at the Komé Camps) used the value of the food inventory as a setoff against amounts owed to it by Taylors, amounts reported to be approximately USD $800,000.

**R.     Esso Chad Secured Taylors' Property Following Termination of the Catering Contract.**

69.     On December 29, 2003, Esso Chad received correspondence from Taylors demanding that Esso Chad guarantee the safety of any Taylors' individuals entering Chad to retrieve Taylors' property.  (*See* December 29, 2003, Correspondence from Mr. H.N.A. Goodman to Esso Chad, attached as Exhibit 25.)  Esso Chad could make no such guarantee. While Esso Chad had control over its base and work sites, it had no control over the public airports, hotels, or roads.  Furthermore, at this point in time, several Chadian suppliers were owed significant amounts of money by Taylors and were understandably upset with Taylors for its continued failure to pay its debts.  Accordingly, Esso Chad informed Taylors that it was in no

position to guarantee the safety of Taylors' employees traveling in Chad. (*See* December 31, 2003, Correspondence from Mr. Robert Jenkins to Mr. H.N.A. Goodman, attached as Exhibit 26.)

70.     Taylors failed to timely collect its property as required under the Catering Contract. (*See* Exhibit 6, Catering Contract at § 2.2.)  Nevertheless, Esso Chad took action to secure Taylors' property (vehicles, records, and other items) in locked storage containers in anticipation of collection by Taylors.  The value of Taylors' assets was not certain – Esso Chad was not responsible for any of Taylors' assets and did not inventory them.  Rather, when Taylors failed to appear on site to take possession of its assets, Esso Chad merely secured them.

**S.     Esso Chad Provided Taylors' Records To Taylors.**

71.     On January 2, 2004, an authorized representative of Taylors' (Mr. Fazal Akthar Mohideen) arrived unannounced at the Komé Camps.[10]  Based upon his unannounced status, he had to be screened prior to admission into the Komé Camps.  Esso Chad gave Mr. Mohideen all documents requested by Taylors and loaded the records into the agent's vehicle for transport back to the capital city of N'Djamena. (*See* January 3, 2004, Email Correspondence from Mr. Gregoire Salangros to Mr. Jon Murphy; January 3, 2004, Email Correspondence from Mr. Jon Murphy to Mr. Gregoire Salangros, attached collectively as Exhibit 27.)  The agent delivered the records to a DHL courier for transport to Taylors.  However, prior being sent, the Republic of Chad – not Esso Chad – confiscated the records because various Chadian suppliers of Taylors had protested to the Chadian government that Taylors owed them money and the government wished to confirm the claims by reviewing the records.

---

[10]  Mr. Mohideen was Taylors' travel agent and was appointed by Taylors as their authorized representative. (*See* January 5, 2004, Correspondence from Mr. Jon Murphy to Esso Chad, attached as Exhibit 28.)   However, Mr. Mohideen was also owed money by Taylors. (*See* January 18, 2004, Correspondence from Mr. Jon Murphy to To Whom It May Concern, attached as Exhibit 29.)   Upon information and belief, Mr. Mohideen sued Taylors to recover this unpaid balance (in excess of USD $200,000).

**T.**  **Esso Chad Continued To Pay Proper Invoices Subject To Its Contractual Right To Withhold Payments To Taylors If Taylors Failed to Pay Its Subcontractors and Suppliers.**

72.     During the course of the Catering Contract, any invoices submitted to Esso Chad by Taylors were reviewed and paid if correct and proper under the particular requirements set out in the Catering Contract. (*See* Exhibit 6, Catering Contract at § 10.1 (Invoicing and Payment) and Attachment 6 (Invoicing Procedures).)  However, Esso Chad had the right to withhold payments and/or deduct payments of pending invoices if Taylors failed to pay its subcontractors and/or suppliers. (*See Id.* at § 10.4 (Obligations to Third Party) and Attachment 6 (Invoicing Procedures).)

73.     Indeed, Taylors had conceded that Esso Chad maintained this right.  Taylors agreed that amounts owed to Taylors were to be applied to amounts owed to their suppliers. (*See* January 5, 2004, Correspondence from Mr. Jon Murphy to Esso Chad; January 14, 2004, Correspondence from Mr. Jon Murphy to Esso Chad, attached collectively as Exhibit 30.)

**U.**  **Esso Chad's Bank Accounts Were Frozen and Esso Chad Continues To Incur Expenses To Resolve the Problems Created By Taylors.**

74.     Following Taylors' exit from Chad with various debts outstanding to its suppliers, Esso Chad and the National Committee for the Oil Project Coordination (Coordination Nationale du Projet Pétrole) endeavored to find ways to compensate Taylors' suppliers.  At the time, based on a patch-work of incomplete and unsubstantiated accounting provided by Taylors, Esso  Chad believed that it owed monies to Taylors.  Therefore, upon instructions from Taylors, Esso Chad proposed a lump sum payment to the suppliers as compensation for the loss suffered as a result of Taylors' flight from Chad.  Some suppliers accepted the proposed payment.

75.     In early-2004, a group of approximately eleven former Taylors' suppliers (made up of suppliers who turned down Esso Chad's settlement proposal) formed an alliance to seek relief from Esso Chad for the amounts Taylors' owed them (the "Taylors' Supplier Group").  On March 24, 2004, the Taylors' Supplier Group obtained an *ex parte* court order to provisionally garnish Esso Chad' s bank accounts.  The garnishment was served on March 29, 2004, at Esso Chad's banks in Chad – Commercial Bank Tchad ("CBT"), Société Générale Tchadienne de Banque ("SGTB") and Banque Internationale pour l'Afrique au Tchad ("BIAT").  The following amounts were frozen at each institution:

| | |
|---|---|
| CBT: | FCFA 970,917,046 |
| SGTB: | FCFA  35,862,073 |
| BIAT: | FCFA  12,319,976. |

The total amount frozen pursuant to the garnishment order was FCFA 1,019,099,950.

76.     In association with the garnishment order, Taylors' Supplier Group brought a court action before the First Instance Court of N'Djamena against Esso Chad, seeking payment of FCFA 1,500,000,000 (the "Group Action").  Taylors' Supplier Group claimed that, regardless of privity of contract, Esso Chad was liable for Taylors' obligation.  This action was rejected by the Court on July 27, 2004; however, the garnishment order remained in place.

77.     Esso Chad filed an application before the President of the First Instance Court of N'Djamena requesting the release of the garnishment order.  However, the balance of Esso Chad's bank accounts on which the attachments were made was already pledged to the benefit of The Law Debenture Trust Corporation plc.  Esso Chad's arguments to extinguish the garnishment were rejected by the President of the First Instance Court on April 29, 2004.  On May 3, 2004, Esso Chad lodged an appeal, filing its appeal submissions before the Court on September 9, 2004, and October 26, 2004 (the Court's decision was not available in writing

before August 30, 2004). The hearing on the appellate submissions was originally scheduled for November 23, 2004; however, it has been postponed indefinitely by the Court.

78. In addition to the Group Action referenced above, another proceeding was initiated against Esso Chad by a single supplier of Taylors – Resourcium (the "Resourcium Action"). Initially, Resourcium was one of the claimants in the Group Action. After the July 27, 2004, Court ruling in the Group Action, however, Resourcium brought a claim in its own name.

79. On August 13, 2004, the President of the First Instance Court issued an *ex parte* order, authorizing Resourcium to provisionally garnish funds purportedly owed by Esso Chad to Taylors. On September 6, 2004, the President of the First Instance Court sustained Resourcium's claim and Resourcium was awarded an Order of enforcement against Esso Chad. (*Id.*) Esso Chad has appealed this Order.

80. On September 23, 2004, and September 27, 2004, Resourcium attempted to obtain funds belonging to Esso Chad at the CBT and SGTB banks. Due to the garnishment order in place related to the Group Action, both banks responded that Esso Chad's accounts were in an overdraft status and did not relinquish any funds. On November 18, 2004, Resourcium arrested 17 vehicles belonging Esso Chad – implying that it will be entitled to sell the cars by auction. In order to avoid such sales, Esso Chad must now challenge the garnishment before the President of the First Instance Court. Resourcium has indicated that it will continue to attempt to enforce the award on Esso Chad's assets.

81. Despite Esso Chad's repeated demands upon Taylors to resolve these matters, Taylors has continued to fail to take any action to pay Taylors' contractors, subcontractors and local suppliers who have obtained the orders of garnishment and seizure on Esso Chad's bank

accounts.   As of the date of the filing of this Answer and Counterclaim, the orders of garnishment and seizure from the Chadian court remain in effect.

82.     In addition to the approximate USD $3 million in Esso Chad's bank accounts that has been frozen, Esso Chad has incurred fees and expenses in excess of USD $600,000 in attempting to resolve the payment issues caused by Taylors' breach of its obligations under the Catering Contract.  These fees and expenses have included fees to secure and review the books and records of Taylors in Chad, and the legal expenses incurred by Esso Chad in contesting the proceedings in the Chadian court.

## VI.   ESSO CHAD'S COUNTERCLAIMS

### A.     Breach of Contract – Subcontractors and Suppliers Claims.

83.     By virtue of its acts and omissions in the rendition of services under the Catering Contract, Taylors is liable to Esso Chad for breaching the Catering Contract and subjecting Esso Chad to liability and damages.  Under the law governing the Catering Contract, a party injured by another party's breach of contract is entitled to damages sufficient to place the injured party in the position it would have enjoyed if the contract had been properly performed by the breaching party.

84.     For example, Taylors has breached the Catering Contract by:

- Failing to pay all of the labor and materials used in connection with providing the catering and related services to Esso Chad under the Catering Contract.

- Failing to exercise reasonable care and diligence to prevent any actions or conditions that could result in a conflict with Esso Chad's best interests. Taylors' refusal to pay its subcontractors has subjected Esso Chad to judicial proceedings in Chad that resulted in a freeze on Esso Chad's bank accounts in Chad.  Taylors' refusal to pay is a failure to exercise reasonable care and diligence, and is certainly contrary to Esso Chad's best interests, as evidenced by the Chadian Court's freeze on Esso Chad's bank accounts.

85.     Taylors' breaches of the Catering Contract as set forth above have caused Esso Chad to incur actual, direct damages that may well exceed USD $ 4 million.

**B.      Breach of Contract – Indemnification.**

86.     By failing to indemnify Esso Chad against the claims of Taylors' subcontractors and the Chadian Government, Taylors, Goodman, and Ali are liable to Esso Chad for breaching the Catering Contract and subjecting Esso Chad to liability and damages.[11]   Under the law governing the Catering Contract, a party injured by another party's breach of contract is entitled to damages sufficient to place the injured party in the position it would have enjoyed if the contract had been properly performed by the breaching party.

87.     Under Section 5.1 of the Catering Contract, Taylors, Goodman and Ali are obligated to indemnify Esso Chad for Taylors' contractual breaches, which have subjected Esso Chad to claims and causes of action related to the loss of property owned, borrowed or rented by Taylors or its subcontractors, and has further subjected Esso Chad to claims, demands, causes of action and a Chadian court's order of seizure resulting in fees and charges that have been assessed or levied by Chad or its political subdivisions against Esso Chad for or on account of any payments earned by Taylors' local suppliers, subcontractors and contractors in connection with the work performed under the Catering Contract.

88.     The breaches by Taylors, Goodman, and Ali of the Catering Contract as set forth above have caused Esso Chad to incur actual, direct damages that may well exceed USD $ 4 million.

---

[11] Although Goodman and Ali are not signatories to the Catering Contract, the indemnification provision described in Section 5.1 of the Catering Contract makes Goodman and Ali responsible to indemnify Esso Chad, and thereby subjects them to the arbitration provision of the Catering Contract.  Indeed, in U.S. court filings, Goodman and Ali objected to being parties to U.S. litigation, and have argued that these matters should be decided in the arbitration proceeding.

**C.**     **Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

89.     Under the law governing the Catering Contract, Taylors impliedly covenanted to act in good faith and deal fairly with Esso Chad in performing the Catering Contract.

90.     Taylors breached this implied covenant of good faith and fair dealing by failing to adequately capitalize its operation in Chad, such that Taylors failed to timely and fully pay its subcontractors for the work to be performed under the Catering Contract, which breach has subjected Esso Chad to liability and damages in the Chadian Court proceedings described herein.

91.     Taylors' breaches as set forth above have caused Esso Chad to incur actual, direct damages that may well exceed USD $ 4 million.

## VII.     ANSWER TO TAYLORS' CLAIMS

**A.**     **Denial of Claims.**

92.     Esso Chad expressly denies all of the claims asserted by Taylors.

93.     Esso Chad specifically <u>denies</u> that:

- Esso Chad never indicated a lack of satisfaction with the services provided by Taylors.  (*See* Request for Arbitration at ¶ 2, p. 2; ¶ 21, p. 6; ¶ 25, p. 7.);

- Esso Chad improperly and prematurely terminated the Catering Contract. (*See* Request for Arbitration at ¶ 3, p. 2.);

- Following termination of the Catering Contract Esso Chad turned over the concession to Mr. Vince Melvin.  (*See* Request for Arbitration at ¶ 3, p. 2.);

- Esso Chad knew of any alleged "betrayal" of Taylors by Mr. Vince Melvin. (*See* Request for Arbitration at ¶ 3, p. 2.);

- Esso Chad desired, supported, or aided and abetted any alleged "betrayal" of Taylors by Mr. Vince Melvin.  (*See* Request for Arbitration at ¶ 3, p. 2.);

- Esso Chad planned to cause early termination of the Catering Contract.  (*See* Request for Arbitration at ¶ 4, p. 2.);

- Esso Chad required Taylors to use local suppliers.  (*See* Request for Arbitration at ¶ 4, p. 2; ¶ 18, p. 5);

31

- Any Esso Chad employee was a "longtime associate" of Mr. Vince Melvin. (*See* Request for Arbitration at ¶ 4, p. 2; ¶ 14, p. 5; ¶ 20, p. 6.);

- Access to the CAMPS was restricted or under "the complete control of Esso Chad" or that they are "accessible only through transportation provided by Esso Chad." (*See* Request for Arbitration at ¶ 5, p. 2, ¶ 12, p. 4.);

- Esso Chad prevented Taylors from exercising control over its employees. (*See* Request for Arbitration at ¶ 5, p. 2.);

- Esso Chad hindered or prevented Taylors from retrieving its records from the CAMPS, recovering its property at the CAMPS, or allowing Taylors employees to enforce any contractual rights. (*See* Request for Arbitration at ¶ 5, pp. 2-3.);

- Esso Chad converted Taylors' property. (*See* Request for Arbitration at ¶ 5, p. 3.);

- Esso Chad aided and/or abetted Taylors' former employees to breach their fiduciary duty to Taylors. (*See* Request for Arbitration at ¶ 5, p. 3.);

- Esso Chad has breached the Catering Contract by failing to pay valid invoices presented by Taylors. (*See* Request for Arbitration at ¶ 6, p. 3.);

- Esso Chad is the de facto government of the Republic of Chad. (*See* Request for Arbitration at ¶ 12, p. 4.);

- Taylors was given "no opportunity for negotiation with respect to [the Catering Contract's] terms." *See* Request for Arbitration at ¶ 15, p. 5.);

- Esso Chad's agreed to a rate increase in the Catering Contract because of "local attitudes." (*See* Request for Arbitration at ¶ 24, p. 7.);

- Esso Chad "urged" Taylors to apply for retroactive hardship relief. (*See* Request for Arbitration at ¶ 25, p. 7.);

- Esso Chad ever guaranteed to Taylors that a request for retroactive hardship relief would be granted. (*See* Request for Arbitration at ¶ 27, p. 7.);

- Taylors' request for retroactive hardship relief was not fairly considered. (*See* Request for Arbitration at ¶ 27, p. 7.);

- Mr. Vince Melvin (or any other Taylors' employee) performed any "additional services" for Esso Chad. (*See* Request for Arbitration at ¶ 32, p. 8; ¶ 38, p. 10.).)

- Esso Chad was unjustly enriched by any alleged "additional services" performed by Mr. Vince Melvin. (*See* Request for Arbitration at ¶ 32, p. 8.);

- Esso Chad ever demanded "a payment of $850,000 be made immediately to Taylors' suppliers or else Esso Chad was going to terminate the [Catering Contract.]" (*See* Request for Arbitration at ¶ 33, p. 9.);

- Esso Chad was aware of, participated in, or encouraged Mr. Melvin's allegedly "disloyal action" in the months prior to the termination of the Catering Contract. (*See* Request for Arbitration at ¶ 37, p. 10.);

- Esso Chad was aware of any allegedly "deliberate pre-ordering . . . of food supplies" by Mr. Melvin. (*See* Request for Arbitration at ¶ 38, p. 10.);

- Esso Chad and Mr. Melvin conspired or planned to for Mr. Melvin to take over the catering services prior to termination of the Catering Contract. (*See* Request for Arbitration at ¶ 39, p. 10.);

- Esso Chad was aware of, participated in, aided, abetted, or encouraged Mr. Melvin's alleged "plan to terminate the Catering Contract." (*See* Request for Arbitration at ¶ 40, p. 10.);

- It was impossible for Taylors' representatives to travel to Chad to secure its assets following the termination of the Catering Contract. (*See* Request for Arbitration at ¶ 41, p. 10.);

- Esso Chad had an obligation to marshal Taylors' property following the termination of the Catering Contract. (*See* Request for Arbitration at ¶ 42, p. 11.);

- Esso Chad confiscated or seized assets/property of Taylors. (*See* Request for Arbitration at ¶ 43, p. 11; ¶ 45, p. 11);

- The book value of Taylors' assets allegedly confiscated were $177,968. (*See* Request for Arbitration at ¶ 43, p. 11.);

- The price of Taylors' assets allegedly confiscated, if purchased by a successor company to the Catering Contract would receive a 10% increase and/or be worth $195,000. (*See* Request for Arbitration at ¶ 43, p. 11.);

- Taylors has submitted valid invoices for services performed prior to the termination of the Catering Contract worth $975,972.29. (*See* Request for Arbitration at ¶ 46, p. 11.);

- Esso Chad seized the "records at gunpoint" or withheld Taylors' records. (*See* Request for Arbitration at ¶ 47, p. 11.);

- The freeze on Esso Chad's financial accounts in Chad, being enforced by the Chadian Government, has been dissolved.  (*See* Request for Arbitration at ¶ 49, p. 12.);

- Esso Chad breached the Catering Contract.  (*See* Request for Arbitration at ¶¶ 51-55, pp. 12-13.);

- Esso Chad converted property/assets of Taylors.  (*See* Request for Arbitration at ¶¶ 56-59, p. 13.);

- Esso Chad breached a duty of good faith and fair dealing owed, if any, to Taylors.  (*See* Request for Arbitration at ¶¶ 60-67, pp. 13-14.);

- Esso Chad is a national or citizen of France.  (*See* Request for Arbitration at ¶ 71, pp. 14-15.)

94.     Esso Chad denies that it owes or could be liable to Taylors for damages for breach of the Catering Contract, conversion of Taylors' property, or for breach of any duty of good faith or fair dealing, or any other matter with respect to Taylors' claims asserted in this proceeding against Esso Chad.  (*See* Request for Arbitration at ¶ 68, p. 14.)

**B.      Defenses to Claims.**

95.     If Taylors sustained any damages as claimed, they were caused in whole or in part by the conduct, actions, and/or omissions of a person or persons, other than Esso Chad, for whose conduct Esso Chad is in no way liable.  Esso Chad asserts that the conduct, actions, and/or omissions of such person(s) or entities, including Taylors, became the sole proximate cause of any damages claimed by Taylors.

96.     Taylors failed to exercise ordinary care, reasonable care, and/or diligence to mitigate its damages, if any.

97.     Esso Chad asserts the affirmative defenses of estoppel, waiver, ratification, accord and satisfaction, discharge, repudiation, failure of consideration, anticipatory breach, and failure to perform conditions precedent.

98.     Esso Chad asserts the affirmative defenses of privilege and legal justification.

99.     Taylors' is not permitted to recover consequential/indirect damages or loss of anticipated profits.  (*See* Exhibit 6, Catering Contract at § 5.4.)

100.    Taylors is not permitted to recover damages arising from the termination of the Catering Contract.  (*See Id*. at § 13.7.)

101.    Taylors' claims, as supported by the facts detailed above, are without merit.

## VIII.  RELIEF REQUESTED

102.    In light of the foregoing, Esso Chad respectfully requests that the Arbitral Tribunal award Esso Chad:

(a)     Actual damages sustained by Esso Chad as a result of Taylors' breaches of the Catering Contract;

(b)     Actual damages sustained as a result of Taylors' breaches of its implied covenant of good faith and fair dealing;

(c)     Specific performance by Taylors, Goodman and/or Ali of the Catering Contract by paying all outstanding bills, invoices and payments due to all of Taylors' subcontractors and suppliers or, alternatively, that Taylors, Goodman and/or Ali reimburse Esso Chad for any payments Esso Chad may make to Taylors' subcontractors and suppliers pursuant to the Catering Contract;

(d)     All costs associated with this arbitration;

(e)     Attorneys' fees, costs, and expenses incurred in connection with its efforts to collect amounts owed and this arbitration;

(f)     Pre-award and post-award interest; and,

(g)     Such other relief as the Arbitral Tribunal may deem appropriate.

103.    Esso Chad further requests that the Arbitral Tribunal reject Taylors' claims in their entirety, to the extent that any colorable claims are put forward.

104.   In the alternative, should the Arbitral Tribunal decide that Taylors is entitled to some or all of the compensation that it has claimed, Esso Chad respectfully requests that the Arbitral Tribunal set-off this amount against the damages to be awarded to Esso Chad.

Respectfully submitted,

FULBRIGHT & JAWORSKI LLP


By: _____
        Mr. Reagan M. Brown
        Mr. David J. Levy
        Mr. Charles Jason Rother
        1301 McKinney, Suite 5100
        Houston, Texas 77010-3095
        USA
        Telephone:  +1.713.651.5151
        Facsimile:  +1.713.651.5246
        Email:  rbrown@fulbright.com
                 dlevy@fulbright.com
                 crother@fulbright.com


        Counsel for Respondent/Counter-Claimant,
        Esso Exploration and Production Chad Inc.


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, Counterclaim and Answer of Esso Exploration and Production Chad Inc., was sent to the following counsel of record on November 30, 2004, via certified mail, return receipt requested:

Mr. John K. Crossman
Zukerman, Gore & Brandeis, LLP
900 Third Avenue
New York, New York  10022
United States of America


_____
        Reagan M. Brown

36