# EXHIBIT H

## WITNESS STATEMENT OF MR. GLEN BEAL

1. My name is Glen Beal. I am over 21 years of age and am competent to make this Witness Statement. All of the statements contained herein are true and correct and, unless otherwise indicated, based on my personal knowledge. I declare under the penalty of perjury that the following is true and correct.

2. I currently reside in Council, Idaho. Prior to beginning my career, I received my undergraduate degree from Lane Community College in 1968. I have over 12 years of experience in remote catering and facilities management and am currently the General Director and President for Remote Projects Services Group, which operates remote catering and facilities management for oil production operations in Sakhalin, Russia.

3. From May 1984 to June 2000, I was Senior Vice President (International Marketing Group) with Universal Services, a firm that provided catering, facilities management, and a variety of other services at remote locations (such as construction sites, oil rigs, and drilling and mining locations) for customers in the oil and gas, construction, and mining industries. Universal Services was purchased by Sodexho Alliance in January 2000, forming Universal Sodexho. I departed Universal Sodexho shortly thereafter.

4. In early 2001, I was approached by Mr. Butch Darce about a possible position with Taylors International Services, Ltd. ("Taylors"). Mr. Darce was an employee with Taylors at that time.

5. On April 1, 2001, I entered into an employment agreement with Taylors and joined Taylors as Vice President. While working for Taylors I was based in Kingwood, Texas. Upon being hired, I quickly learned that Taylors maintained various operations throughout the world; however, they appeared to maintain no formal corporate structure or management. Furthermore, there was no clear financial or accounting structure amongst the various operations.

1



6.   During my tenure with Taylors, I never saw an accurate set of financial statements reflecting Taylors' true financial condition. (In the summer of 2003, based upon my observations of Taylors' sheer lack of corporate structure and accurate financial statements, as well as witnessing Taylors' difficulty in acquiring operational funding, I suggested that Taylors consider hiring Mr. James M. Severns to organize the corporate structure and prepare accurate financials statements.)

7.   One of the initial projects that I worked on for Taylors was preparing a bid offer for a potential catering services contract with Esso Exploration and Production Chad Inc. ("Esso Chad"). The bid offer was for a contract ("Catering Contract") to perform catering and general camp services at Esso Chad's Komé Base Drilling Camp in Komé, Chad, as well as itinerant remote camps near Komé (collectively the "Komé Camps"). The Esso Chad bid tender was issued in late August 2001. Taylors' bid offer was due to Esso Chad in September 2001.

8.   In connection with preparing the bid offer for Esso Chad, I introduced Mr. Vince Melvin to individuals in Taylors. Specifically, I introduced him to Mr. Shabbir Ali and Mr. Sandy Goodman. I knew Mr. Melvin from my work with Universal Services and also knew that Mr. Melvin had experience with providing catering services and facilities management in Gabon, Africa, for Shell Exploration & Production Company. Accordingly, I believed that his experience in the region could be used to prepare the Taylors bid for the Catering Contract. Indeed, I was unaware of any individual within Taylors who maintained any such experience in the region and I felt that hiring Mr. Melvin would be necessary to prepare a viable bid offer for the Esso Chad work in Africa.

9.   Mr. Melvin was hired by Taylors in September 2001. Mr. Melvin and I worked together to prepare the Taylors' bid offer for the Catering Contract.



10. As we developed Taylors' bid offer to be submitted to Esso Chad, Mr. Melvin and I were in constant contact with Mr. Ali. We made him aware of all of the underlying data that was used to prepare the bid – including, but not limited to, projections regarding staffing, logistics, material sourcing, suppliers, working capital, cash flow, revenue, expenses, and profits.

11. During our conversations, Mr. Ali informed me that Taylors would be taking a three (3) percent deduction from every payment submitted to Taylors by Esso Chad (to account for Taylors' overhead expenses), rather than allocating all of the Esso Chad payments to its Chad operations. This same three (3) percent deduction would also hold true for the contract and work that I administered for Taylors in Russia.

12. Prior to submitting Taylors' bid offer for the Catering Contract to Esso Chad, Mr. Ali approved both its substance and form.

13. Between the time that Taylors received the bid tender from Esso Chad (on August 30, 2001) and the date that Taylors submitted its bid offer (on September 13, 2001), I had very few conversations with Esso Chad related to the terms of the proposed Catering Contract. In my years of experience preparing bid offers related to remote catering and facilities services, negotiation of the terms of the contract by bidders (during the time between receipt of the bid tender and submission of the bid offer) is typical – except in the case of government contracts, where negotiation is usually not allowed. Here, Taylors did not attempt to negotiate any of the terms of the proposed contract with Esso Chad prior to submitting its bid offer. If Taylors management had any concerns related to the terms of the proposed contract, they did not convey those concerns to me. If they would have done so, I would have raised those concerns with Esso Chad prior to submitting Taylors' bid offer.

3



14. On September 13, 2001, I submitted Taylors' bid offer to Mr. Dan Deer with Esso Chad. (Prior to my involvement with Taylors' bid offer for the Catering Contract, I had not known Mr. Deer.) It was my understanding that Esso Chad had appointed Mr. Deer in Houston, Texas, to be the individual authorized to accept the bid offers related to the Catering Contract.

15. On or around October 1, 2001, I was notified by Esso Chad that Taylors had been awarded the Catering Contract.

16. Following the award of the Catering Contract to Taylors, I spoke with Dan Deer and arranged for an "advance mobilization payment" of $75,000. Esso Chad provided the $75,000 mobilization advance to Taylors in October 2001. At that time, Vince Melvin and I also asked Taylors' management to provide additional mobilization funds; however, Taylors was unable to provide any funding.

17. In my discussions with Taylors' management, the initial plan was to have Mr. Melvin relocate to Chad to start up the operation; however, during that time Mr. Melvin was also responsible for Taylors' business growth in Thailand and was splitting his time between both locations.

18. Following the completion of the bid tender, my work focus within Taylors turned to the Taylors' operation in Sakhalin, Russia. The company formed to operate in Russia was called Taylors Group Sakhalin, and was owned jointly by Taylors, Mr. Alex Flipov (a Russian individual), Mr. Bill Davis, and myself. By the summer of 2002, I was spending most of my time developing the business in Russia.

4



19. However, during that time, I was also well aware of the Chad operations and kept in regular contact with Mr. Vince Melvin and Taylors' management regarding the issues faced by the Chad opeation. Indeed, when Taylors' management – typically, Mr. Ali – felt that Esso Chad's payment was late on Taylors' invoices, Mr. Ali would contact me and have me speak with Mr. Deer to clear up any late payment issues.

20. Additionally, I was involved with various contract amendments to the Catering Contract. Specifically, in May 2002, I was involved with the negotiation of an amendment to the Catering Contract to increase the rate paid by Esso Chad to Taylors. In my opinion, the rate that Esso Chad originally agreed to pay Taylors in the Catering Contract for the services in Chad was both fair and equitable. Indeed, when Esso Chad agreed to Taylors' request that the rate be increased in May 2002, the rate being paid to Taylors following the increase should have been more than enough to enable Taylors to earn a reasonable profit on the work in Chad.

21. During my communications with Mr. Melvin from late 2001 through the end of 2003, regarding the Chad operation, he informed me of various issues, including but not limited to the following:

- Taylors continually refused to hire a fully qualified "on-site" accountant, doing so only a few months prior to the termination of the Catering Contract;

- Taylors failed to provide adequate working capital for the Chadian operations;

- Taylors failed to provide adequate funds to pay its suppliers and employees in Chad; and,

- Taylors failed to buy food competitively on the world market because of lack of bank lines or sufficient credit. To buy food in dollar-based-markets would have helped offset the devaluation of the U.S. dollar against the Euro.

5



These complaints from Mr. Melvin were constant during his tenure with Taylors in Chad. Indeed, he also noted that during his tenure with Taylors in Chad, he was incarcerated twice by Chadian authorities for Taylors failing to pay its suppliers and/or Chadian debts.

22.     It did not surprise me that Taylors and Mr. Melvin were experiencing these problems in Chad, as I had a similar experience with the Taylors Group Sakhalin operations in Russia beginning in the middle of 2002. That is, after the initial mobilization of the operation in Russia in April 2002, it was clear that Taylors was unable to provide the amount of funding for the Russian operation that Mr. Ali had originally promised.

23.     In late 2003, I was aware from communications with Mr. Vince Melvin and Taylors' management, including Mr. Ali, that Taylors' operations in Chad were in serious financial difficulty. Mr. Ali said to me that he was attempting to acquire money from any source possible; however, because Taylors appeared to have no corporate banking relationships or lines of credit, and did not take the steps required to establish these facilities, Taylors could not generate funds to use in Chad.

24.     Indeed, in the spring 2003, Mr. Goodman asked me to travel to Santa Barbara, California, to meet with a venture capital firm. This meeting was arranged by Mr. Goodman's son-in-law, Michael Narachi. The meeting was not productive, as the venture capital firm could not understand why Taylors – a long established business – needed venture capital funding when it should have been able to easily acquire an operating line of credit.

25. Additionally, in the summer of 2003, I also met with Mr. Ali and Mr. Melvin in the Taylors' offices in Brighton, England. At that meeting, we discussed the losses related to the foreign currency exchange rate. Mr. Melvin told Mr. Ali that the exposure was an issue and that Taylors needed to hedge against this exposure in the foreign currency market. However, to my knowledge, Mr. Ali did nothing to hedge against this exposure.

26. In December 2003, I became aware of the termination of the Catering Contract between Taylors and Esso Chad.

27. In early 2004, following the termination of the Catering Contract, I met with Mr. Goodman, Mr. Ali, Mr. Darce, and Mr. Michael Narachi (Mr. Goodman's son-in-law) at Mr. Narachi's residence in California. The central topic of conversation at this meeting was the demise of Taylors' operations in Chad.

28. At this meeting, I asked Mr. Ali to explain, among other things, why Taylors had not hedged against the foreign currency exposure inherent in the Catering Contract. He was unable to provide an explanation or justification as to why he and Mr. Goodman had failed to take one of the most basic steps of financial risk management when engaged in international business.

29. In the end, in my opinion, the failure of the Chadian operation can be directly attributed to Taylors' failure to provide adequate funding, operational management, and/or appropriate field personnel (specifically, an accountant). Furthermore, to my knowledge, Mr. Melvin did nothing to contribute to the demise of the operation. On the contrary, Mr. Melvin went to considerable lengths to attempt to save Taylors' operations in Chad – indeed, as noted above, he even endured being put in jail for the sake of the Taylors' business interests.



30. By around late 2002, my employment agreement with Taylors ended on its own accord. At that time, my salary was being paid out of the Russian operations and I had no further involvement with Taylors. The failure of Taylors' operations in Chad had an extremely detrimental impact upon the projects with Exxon Mobil Corporation in Russia and resulted in the cancellation of the work being performed by the Russian operation.

31. At that time, Mr. Flipov, Mr. Davis and myself, along with a new investor (Mr. Mike Mertz) made a decision to buy out Taylors' interest of the Russian operation. (We also decided to change the name of the company to get rid of the Taylors' stigma, as any connection to Taylors was considered a liability.) Taylors agreed to the buyout. We will make the final payment to Taylors on August 30, 2005. (NOTE pAyment has been made, escrow company confirmed recept)

Dated this 25 day of Aug, 2005

_____
Mr. Glen Beal

