# EXHIBIT I

Claimant/Counter Respondent
Shabbir Ali
First Witness Statement
Date: 26 September 05

IN THE INTERNATIONAL COURT OF
ARBITRATION OF THE INTERNATIONAL
CHAMBER OF COMMERCE

Arbitration No. 13 491/JNK

TAYLORS INTERNATIONAL SERVICES LTD

Claimant/Counter Respondent

-and-

ESSO EXPLORATION AND PRODUCTION CHAD INC

Respondent/Counter-Claimant

FIRST WITNESS STATEMENT OF
SHABBIR ALI

I, SHABBIR ALI, of P.O Box 16446, Jeddah 21464, Saudi Arabia MAKE OATH AND
SAY AS FOLLOWS:

1.      The contents of this statement are true to the best of my information,
knowledge and belief and the facts stated herein are known to me personally
unless otherwise stated. Where the facts stated are not known to me
personally I have stated the source of my information.

2.      I make this statement in support of the Claimant's ("Taylors") claim in the
above mentioned Arbitration against the Respondent ("Esso Chad").

3.      Where I refer to documents throughout this statement, they are references to the documents that have been disclosed on CD by the parties or by e-mails passing between the parties' legal advisers unless stated otherwise.

4.      Taylors is a Channel Islands company.   It operates internationally through branches or joint venture companies. I have been working with the Taylors group of companies since 2 May 1981 in various management and other senior positions. I am currently Taylors Managing Director.

5.      I am also a qualified accountant and have 28 years experience in this field.

6.      Taylors obtains its working capital for its contracts from loans provided by banks, using the receivables from its contracts as collateral supported by personal guarantees provided by its Chairman, Mr HNA Goodman.

7.      Taylors International Services Tchad Limited is a subsidiary of Taylors and was formed on 9 May 2002 (the application was made in November 2001) to perform the Esso Chad Catering Contract ("the Catering Contract").

8.      The Catering Contract required the provision of catering and general camp services, primarily the provision of meals for the project workers, laundry and janitorial services for Esso Chad's Kome camp.

9.      Taylors bid for the Catering Contract was prepared by Glen Beal, Taylors' Vice President of International Business Development.   On or about 21 August 2001 Glen Beal notified me that a tender was to be issued by Esso Chad for a catering contract in Chad. He advised me that Taylors should bid for this as he had connections with Esso Chad and felt confident that Taylors could win the Catering Contract.

10.     We decided to recruit, on Glen Beal's recommendation, Vince Melvin to assist with the pricing of the tender bid and the eventual management of the

project if Taylors were awarded the Catering Contract. Vince Melvin had previously worked for Sodexho in Gabon and assured Taylors that he had considerable knowledge and experience of Africa and the bidding process for projects within that region.

11.    Before Vince Melvin formally joined Taylors, he travelled from Gabon to Houston to meet Glen Beal and spent approximately 2 weeks working with Glen Beal preparing Taylors' bid. The information required to calculate our pricings for the project was provided by Vince Melvin. This included food cost per man per day for expats, TCNs and nationals and the number of employees required to do the job based on the level of services required by Esso Chad, as outlined in their tender documentation.  Glen Beal and Vince Melvin together prepared a trading forecast (see Taylors' email to Esso Chad dated 14 September 2005) and supplied me with a copy of all the supporting information. From this, I prepared my own trading forecast and cash flow forecast for the Catering Contract (see Taylors' email to Esso Chad dated 14 September 2005).

12.    Taylors was successful in its tender bid and was awarded the Catering Contract.  Vince Melvin arrived at the Kome camp in time for the commencement of Taylors' mobilization and was appointed Taylors' Vice President of Business Development for Africa and the Far East, responsible for the development and operation of all of Taylors' business in Africa and the Far East. Vince Melvin's first task in this role was to arrange for the provision of staff and supplies for the project.

13.    On or around  7 October 2001, Vince Melvin travelled to France to meet with a potential supplier.  He called me from France at this time and said that he had made an arrangement with a supplier and placed an order. He also informed me that we would have to buy two containers to deliver these goods because the return of containers from Africa was not reliable. The supplier was not prepared to send the goods in their own containers in case

they were not returned. Vince Melvin also told me that he had agreed a 60 day credit period for Taylors. The first order totalled approximately US $120,000 and I approved this purchase over the phone. However, I subsequently learnt from Vince Melvin that he had cancelled this order in favour of sourcing food stocks from local suppliers.

14. Vince Melvin called me a day or so later and said that he would be travelling to Chad and needed some cash to take with him to enable him to purchase additional items required for the start up of the Catering Contract.

15. I contacted Mr Goodman, Taylor's Chairman in the UK, and he agreed to loan £10,000 sterling to Taylors for this urgent expenditure. The £10,000 was delivered to Vince Melvin in Paris by Mr Goodman and after receiving this, Vince Melvin went to Chad.

16. Once in Chad, Vince Melvin reported his daily progress on the Catering Contract to me via telephone.

17. Mr. Goodman and I suggested to Taylors' management team in Chad that we should travel to Kome at the start of the project to assist with the initial mobilization. However, we were informed that as beds at the camp and Esso Chad's internal flights were at a premium, Esso Chad had advised that this would not be possible, (see Jon Murphy's letter of 22 October 2001 at Taylors' email to Esso Chad dated 23 September 2005). This was an example of the level of control Esso Chad exercised over the Kome camp and over Taylors' performance of the Catering Contract.

18. On or around 1 October 2001, Taylors nominated Mr Jon Murphy as its Project Manager in Chad. Jon Murphy had a military background and had demonstrated his ability to work extremely well for Taylors in Kosovo and Macedonia on Taylors' Nato contract over a period of two years. Taylors

4

were therefore confident that he would be the best person to run the Catering Contract.

19.    Jon Murphy arrived in Chad on 20 October 2001.

20.    On or around 1 November 2001, Vince Melvin complained to me about Jon Murphy's alleged inability to run the Catering Contract, claiming that Jon had no experience in Africa. I told him that Jon Murphy was very competent and that Taylors had full confidence in his abilities. However, Vince Melvin's complaints increased and approximately two weeks prior to mobilisation, he informed me that Esso Chad had asked that Jon Murphy be removed from the project. We therefore were left with no choice but to remove Jon Murphy from the project. Jon Murphy's last day on the project was 18 November 2001. After leaving the Kome camp, Jon Murphy was appointed Taylors' General Manager for Thailand.

21.    Jamie Williams had been recruited to the position of Deputy Manager of the Catering Contract on or around 25 October 2001 and on Jon Murphy's departure from Chad on 18 November 2001, he was promoted to the position of Project Manager. Jamie Williams' responsibilities included the establishment of sources of supply for all food stocks and goods required for the Catering Contract.

22.    Whilst he had been Project Manager, Jon Murphy had started recording expenditure in line with Taylors' recommended procedures. Jamie Williams continued following the same procedures. Vince Melvin was also provided with a standard set of Taylors' accounting documents (see Taylors' email to Esso Chad dated 23 September 2005) to complete regularly.

23.    Up to 31 December 2001 US $405,113.12 was spent on mobilization and supplies, see Taylors' email to Esso Chad dated 23 September 2005).

24.  I quickly became aware that Chad was a very difficult country to operate in. Taylors' use of local suppliers and employees meant that nearly all of its costs were incurred in local currency, which was tied to the Euro. However, as provided under the Catering Contract, Taylor's payments for its services were made in US dollars. As a consequence of the severe weakening of the US dollar against the Euro during the Catering Contract, Taylors suffered an adverse exchange loss of some 25%. In addition, Taylors could not procure goods for delivery by road via Douala, Cameroon as there were no refrigerated trucks available, the roads were almost non existent and the security of goods in transit could not be guaranteed. This route was particularly important to us because Doula, although some distance away from Kome, was the nearest port and all other routes were a lot more difficult. Equally, the efficiency of Chadian labour was way below par and living conditions in the camp were unsatisfactory. There was a shortage of accommodation and accommodation units had major maintenance problems and the storage facilities for supplies provided by Esso Chad were inadequate.

25.  The difficulties in obtaining supplies and the deficiencies in the conditions within the Kome camp, which took up a considerable amount of Taylors' personnel's time to resolve, contributed to Taylors suffering financial losses. The adverse effect of the exchange rate fluctuations added to the problem, which was further compounded by the alterations to the services required by Esso Chad once the Catering Contract had been awarded. For example, Taylors prepared its bid for the Catering Contract on the basis that its expatriate employees would be working on a rotation of 3 leaves per year. However, after Taylors had entered into the Catering Contract, Esso Chad required this leave rotation to be increased to a minimum of 6 leaves per year. When we mobilized we were told by Esso Chad that our leave rotation should be increased due to difficult conditions of the Kome camp. Vince Melvin's letter dated 16 April 2002 at Esso page 996 lists the changes and extra costs involved in complying with Esso Chad's instructions. As a result,

Garry Marshall and other management of Esso Chad intimated to Vince Melvin of Taylors that Esso Chad would issue an increase in Taylors' fees to compensate for these increased operating costs. However Taylors did not receive compensation for this until 31 May 2002 when the rates were increased.

26.    From the time when Taylors began work at the Kome camp, on or around 15 November 2001, all personnel appeared to be very pleased with the standards of service and quality of the food Taylors provided. In fact, a number of customers commented that the service was superior to that provided by CIS (the previous catering contractor). There were, no doubt, small teething problems, but these were resolved quickly.

27.    We immediately noted that the food costs, which were the biggest part of our expenditure, were more than double the budget and the labour cost was also very high,   due to the need for extra nationals to be retained as the efficiency of Chadian nationals was much worse than we had expected.

28.    Trading figures for the period 15 November 2001 to 31 December 2001 highlighted a loss of US $139,023.08, against a forecast profit of US $4,514. (See Taylors' email to Esso Chad dated 14 September 2005).

29.    This loss was brought to the attention of Esso Chad on several occasions. On or around 10 April 2002, Taylors was asked by Garry Marshal, I believe, of Esso Chad to formally write to Esso Chad to request a price review. This Taylors did on 16 April 2002 (see Esso Chad file 996).

30.    On 25 April 2002 Dan Deer, Esso Chad's Contracts Manager wrote to Vince Melvin confirming a price increase of 25% (see Esso Chad file 991). The price increase was not effective  until 21 May 2002 (see Esso Chad file 987) and was not back dated to the start of the Catering Contract, which would

have been appropriate in our view since additional costs were incurred by Taylors from the very beginning of the Catering Contract.

31. During the period January 2002 to May 2002, Taylors incurred further losses of US $366,383.27 against a forecasted profit of US $189,926 (see Taylors' email to Esso Chad dated 14 September 2005).

32. Taylors prepared its cash flow forecast (see Taylors' email to Esso Chad dated 14 September 2005), based on (a) its profit forecast in the trading results and (b) the number of residents being at a maximum of 536. With the increase in number of camp residents Taylors' cash requirements increased. The increase in population of the camp may have ultimately had the effect of increasing Taylors income, but in the short term our cash outlay increased in order to provide the services under the Catering Contract. We then had to wait 60 days to receive payment from Esso Chad.

33. On or around 24 May 2002 Mr Goodman raised further capital of £750,000 sterling by using his own assets as collateral. The first instalment of CFA 63,759,020 (£60,000) of Mr Goodman's loan was sent to Chad on 12 April 2002, (see Taylors' email to Esso Chad dated 23 September 2005). The first instalment was sent as an on account payment while the approval was pending.

34. I also sent £40,000 sterling of my own money to Chad on or around 4 April 2002 to support the Catering Contract, (see SGBT statement dated 11 April 2002, account in the name of Vince Melvin, CFA 42,426,643 at Taylors' email to Esso Chad dated 23 September 2005). The sum of £40,000 was repaid to me on 4 September 2002.

35. In the meantime Vince Melvin contacted me several times to advise me that Esso Chad wanted Taylors to buy from local suppliers to meet the socio-economic conditions they had agreed with their funders (See Esso Chad file

2904). This requirement to purchase from local suppliers cost Taylors dearly, because, as stated above, local supplies had to be paid for in local currency which became progressively stronger against the US dollar. Furthermore, Taylors was unable to claim back all of the import duties on imported goods from Esso Chad, as provided for under the Catering Contract, as Chachati, its main supplier, could not produce the correct documentation to enable Taylors to claim these duties. Chachati maintained that it was too difficult to produce the documents required by Esso Chad. (Although some documents were eventually produced and we were able to claim the duties from Esso) This compounded Taylors problems as import duty on imported goods accounted for up to 62% of the price of the goods.

36. In spite of the increased costs, Taylors continued to provide an excellent standard of service. In or around September 2002, an external inspection of the Driller's camp at the Kome camp was undertaken and yielded very goods results. Taylors' management of food production was singled out for particular praise and the service levels were judged to be "outstanding", (see e-mail of William Saavedra dated 7 September 2002 at Taylors' file 31, page 405).

37. Taylors' losses under the Catering Contract continued and it began to fall behind with its payments to suppliers. Esso Chad asked Taylors to hold weekly conference calls to report on its progress with the project. During these conference calls it was made clear by Mr Goodman that Taylors was losing money on the Catering Contract and the strength of the Euro was making the situation worse.

38. Chuck Roberts of Esso Chad suggested to Mr. Goodman that Taylors should submit a request for a hardship claim due to adverse currency fluctuations and he guided Taylors on how to prepare this, (See Esso file 442). Taylors was given to understand during a conference call between Chuck Roberts of

Esso Chad and Mr Goodman that Esso Chad would review Taylors' request favourably.

39.     On or around 2 July 2003, Taylors submitted its request for a hardship payment (see Exhibit 17 to Esso Chad's Answer & Counterclaim). However, Taylors was later advised that its claim had been rejected by the ExxonMobil treasury in Dallas.

40.     In one of my conference calls around this time with Esso Chad, Mr Dan Deer alleged that Taylors' losses under the Catering Contract were due to the fact that it was transferring funds from the Catering Contract to other projects. Dan Deer also alleged that Esso Chad could provide evidence to support this allegation. I told him that his allegation was completely unfounded and incorrect and that we would very much like to see the documentation he was alluding to. However, Dan Deer has never supplied Taylors with any documentation to support this false allegation. I can confirm that no funds have ever been transferred out of this Catering Contract to any other operation.

41.     Following the rejection of Taylors' hardship claim, we made a series of requests, via Vince Mevin, for a price increase under the Catering Contract. Vince Melvin wrote to Esso on 18 June 2003 (see Esso Chad's file 2944) outlining the reasons for Taylors' cash flow problems. This letter was followed up with a series of weekly phone calls to Esso Chad, during which Dan Deer said that Esso Chad would check the prices of other companies operating in the area and then revert.

42.     On 23 September 2003, Mr Goodman and I visited the Kome camp to meet with Mr Ron Parish of Esso Chad.  Ron Parish discussed the cash flow problems Taylors had faced and indicated that Esso Chad was generally satisfied with the services Taylors was providing but very unhappy with the

creditors situation. Mr Goodman explained that he had sent additional funds from his own resources to relieve some of the cash flow problems being experienced by Taylors. Ron Parish advised us that Esso Chad wanted to monitor Taylors' performance of the Catering Contract over the coming weeks before they granted a price increase. He indicated that there were additional funds that might become available to Taylors once Esso Chad was satisfied with Taylors' financial performance (which appeared to me to be a somewhat "chicken and egg" argument).

43.     Following this meeting, financial updates were provided to Esso Chad. However, Taylors' financial position did not improve during this period and a price increase became all the more necessary. Vince Melvin was therefore instructed to make a further request for a price review to Esso Chad and on 15 December 2003 Vince Melvin wrote to Esso Chad requesting (a) a price increase back dated to July 2003 when Taylors first wrote to Esso Chad to notify them of the situation; (b) if the price was not back dated, an advance payment of one million dollars to pay creditors, with this amount to be deducted from Taylors' bills in 10 instalments; and (c) the requirement for goods to be supplied from local purchases to be relaxed, with the exception of fruit and vegetables, (see Exhibit 20 to Esso Chad's Answer & Counterclaim).

44.     Taylors did not receive a written response to the above letter. However, on or about 15 December 2003 Vince Melvin met with Bob Baker of Esso Chad. Following this meeting, Vince Melvin telephoned to advise me that Esso Chad had agreed a price increase as suggested in our letter of 15 December 2003 (Esso page 561), but that they wanted Taylors to send a payment of US $850,000 by the following day, otherwise the offer would be withdrawn. The price increase would not be back dated and there would be no advance payment. Taylors could not access this level of funds within the time scale proposed and I had no option but to report back to Vince Melvin that we

could not comply with Esso Chad's requirements for the price increase at such short notice.

45.    As Taylors' was unable to meet Esso Chad's conditions for a price increase, I believed that Taylors would continue, at least in the short term, to suffer losses under the Catering Contract. I therefore approved Mr Goodman's letter to Esso Chad of 17 December 2003, (see Exhibit 21 to Esso Chad's Answer & Counterclaim).

46.    On 19 December 2003, Esso Chad terminated the Catering Contract on the grounds of Taylors' alleged insolvency and offered a new catering contract to Senev SSI. Contrary to Esso Chad's belief, Taylors was not insolvent at this time. The group financial statements at 31 December 2003, a copy of which was disclosed by Taylors' by e-mail dated 14 September 2003, shows that, excluding the Chad subsidiary, the Taylors group of companies had an annual turnover of US \$37,042,896. The Taylors group was able to and did provide support to the Chad Operation in addition to the personal funds provided by Mr Goodman, which he borrowed from his bank and his family. For example, the following amounts were sent in June 2003 from the group to help fund the Chad Operation:

1. Taylorplan Saudi Arabian Markets Limited, Saudi Arabia  \$207,000
2. Taylors International Services Inc                        \$110,000
3. Taylors Investments Limited                               \$200,000
4. Mr Goodman                                                \$150,000

In total during 2002 and 2003 Mr. Goodman provided loans totalling US \$2,357,000 to the Chad subsidiary. This was in addition to a number of expenses paid by some of the companies in the Taylors Group (see, for example, file 24 pages 54 – 58, 242 – 243, 245 – 253, 274 and 276 – 278).

0399/2442566 (2)/26 September 2005

47.    During the last 3 months of the Catering Contract, the purchase of food increased from approximately US $250,000 to approximately US $600,000 per month. Labour costs also significantly increased during this period. A schedule of Taylors' supply costs and labour costs for 2003 has been disclosed at Taylors' file 24, pages 94 – 96. I was really shocked by these figures as during this period Vince Melvin had reassured Taylors that he had maintained food and labour costs at a sustainable level, with food costs being between US $5.50-6 for nationals and US $10-11 for expatriates per man, per day.

48.    I would add that Vince Melvin forwarded to me, by mistake, a report of Gregorie Salangros addressed to him, (see Taylors' email to Esso Chad dated 23 September 2005). This report showed that Vince Melvin's reported food cost had been understated and Taylors was not making any money from the Catering Contract or the Maintenance Contract.

49.    The heavy purchasing by Taylors in the final three months of the Catering Contract can only be explained by either (i) an intentional building up of stocks, (ii) a high level of non receipt of goods or (iii) incorrect calculation of consumption figures. As Taylors operated on food cost of US $10.50 per man per day for expatriates and US $5.50 for nationals, then its total food consumption for October and November 2003 works out as follows:

|  | Man days | Food Cost | Total US $ | Monthly Total US $ |
|---|---|---|---|---|
| Oct    03    - Expatriates | 14394 | 10.50 | 151,137 |  |
| Oct 03 - Nationals | 15138 | 5.50 | 83,259 | 234,396 |
| Nov    03    - Expatriates | 12994 | 10.50 | 136,437 |  |
| Nov 03 - Nationals | 14409 | 5.50 | 79,250 | 215,687 |

50.     There was no way that purchases could have been more than US $250,000 per month. These figures set out above are converted from CFA at rate of exchange of US $1 = CFA 550. The effect of the reduced value of the US $ has been included in this figure. The purchase figures incurred by Taylors during the final three months of the Catering Contract are more than double the amount they should have been.

51.     Based on the above information I can only assume that these additional expenses were deliberately incurred to exacerbate Taylors' cash flow problems, thereby jeopardising its position under the Catering Contract or that some kind of fraud has been perpetrated (as referred to in the witness statement of Jon Murphy).

52.     I also believe that Vince Melvin provided extra services to Esso Chad at Taylors' cost to curry favour, undermine Taylors and gain support for his plan to usurp the Catering Contract. These extra services were first brought to my attention in Vince Melvin's letter of 15 December 2003 to Esso Chad which listed a number of services which were provided by Taylors but not required under the Catering Contract, including for example, the introduction of new positions on the Taylors management team, namely HSE supervisors, customer services, a language teacher and a site engineer. In this letter (see Exhibit 20 to Esso Chad's Answer & Counterclaim), Vince Melvin stated "...it is clearly appreciated by Esso that these positions have improved the quality of life for the camp residents". This clearly indicates that Esso Chad had knowledge of these additional services. Furthermore, given Esso Chad's tight control over the project, I cannot accept that Esso Chad were not aware of the additional services Vince Melvin provided and the benefits they produced for Esso Chad. In this respect, I believe Esso Chad were unjustly enriched by these additional services. Taylors did not benefit at all from the provision of these services.

53. Vince Melvin resigned on 17 December 2003. According to the terms of his employment under the Catering Contract (see Taylors' file 46.2, pages 445 - 450), he was not permitted to work for any of Taylors' clients or employ any of Taylors' employees for a period of one year. In violation of his employment contract, he was involved in the taking over of the Catering Contract by Senev SSI, which was Taylors' labour supplier.

54. After the termination of the Catering Contract, I telephoned Vince Melvin to discuss possible ways of protecting Taylors' position. I asked him to return all stock allegedly supplied by Chachati. His answer was, Chachati will not accept. I then offered to send someone from Taylors to collect all the stock and assets but he informed me that anyone who came to the Kome camp would be arrested.

55. Esso Chad did not give Taylors the opportunity to remove its assets. In fact, they allowed Senev SSI to use its stock and to recruit its employees without establishing the loss this would cause to Taylors.

56. Senev SSI latterly produced a stock check of the items it appropriated from Taylors. However, due to the lapse in time, Taylors was unable to verify the accuracy or otherwise of the stock check. I do know, however, that it is not complete. For example, Taylors had two years supply of vector control chemicals, which were not included on the list. There were also a number of other items which Taylors' ex employees confirmed were received for Christmas meals which were not on the list. In additional, a large quantity of frozen meats ordered from Chachati were not on the stock sheets.

57. Esso Chad refused to assist Taylors in the securing of its assets and documentation. When Taylors' records were finally returned they were incomplete and its computers have yet to be returned. Taylors has therefore been unable to verify suppliers' claims for unpaid invoices or assist Esso Chad to defend the claims they say have been made against them by these

suppliers. Based on the documentation available to us (which was either returned from Chad or supplied by the suppliers following numerous requests), we have been able to verify suppliers' invoices in the sum of US $1,066,480.98, whereas Esso Chad appear to have accepted the suppliers unsubstantiated claims in the sum of US $3,457,171.21 (see Taylors file 10.13 page 1).

58. Nevertheless, despite the lack of documentation, Taylors did authorise Esso Chad to make certain payments to its creditors. Esso Chad initially agreed to do this but then reneged on this agreement (save in respect of 5 payments). To the best of my knowledge, Esso Chad have not approved a number of Taylors' invoices which still remain outstanding in the sum of US $1,298,013.97 (see Taylors file 7.16 page 1).

59. I can only assume that Esso Chad chose to terminate Taylors' Catering Contract on the assurance of Vince Melvin that stocks were on site and employees were there ready to operate under a new contract. Vince Melvin ensured that this was the case, at Taylors' expense, and this explains why Taylors' costs over the final three months of the Catering Contract increased so dramatically. However, I cannot understand why, if, as alleged by Esso Chad, Taylors' services were so inadequate they would offer the new catering contract to Senev SSI who employed the same personnel who operated the Taylors' Catering Contract and who used the very same suppliers. It also makes the decision to award Taylors the Maintenance Contract, which was signed by Esso Chad in September 2003, somewhat confusing if Taylors services had really been so inadequate to that point.

60. To raise additional funds for the Catering Contract in order to improve the timing of paying its suppliers, Taylors had previously attempted to form a joint venture with Mr Bechir by selling him part of the Taylors company. Mr Bechir is the owner of Senev. These discussions were not successful as the parties were unable to agree on a purchase price. However, when Taylors

was invited by Esso Chad to bid for new work, it decided to form a joint venture with Senev and entered into a Memorandum of Understanding with Mr Bechir on behalf of Senev on 25 September 2003 to form a new company, (see Taylors' email to Esso Chad dated 23 September 2005), but nothing further came of this.

61.     Having had sight of Esso Chad's disclosure in this Arbitration, I note that Esso Chad paid Senev SSI a "personnel signing on bonus" of US $94,246.37 (see Esso page 1107). I do not know whether it is a coincidence or not that this "personnel signing on bonus" is precisely the same amount Taylors authorised Esso Chad to pay to Senev SSI out of monies owed to Taylors for its employee salaries up to 19 December 2003. However, it does make me wonder whether, with the approval of Esso Chad, Senev SSI used the sum of US $94,246.37 to entice Taylors staff to breach their employment contracts and join Senev SSI.

62.     I calculate Taylors' loss of its expectation interest in the remaining term of the Catering Contract (due to Esso Chad's unlawful termination) as follows:

The duration of the Catering Contract was 3 years. The Catering Contract was therefore due to terminate on 30 September 2004. It was terminated on 19 December 2003, i.e. 285 days early. Taylors' loss of revenue on the Catering Contract is therefore estimated at:

285 days x 500 expatriates per day x $20.31 = $2,894,175, plus
285 days x 500 nationals per day x $6.69 = $ 953,325

Total remaining catering income at US $3,847,500. Taylors' expected profit being 20% = $769,500. The loss of the Maintenance Contract profit would be in addition to this figure.

These figures are calculated on the prices Esso Chad was paying to Taylors at the time the Catering Contract was terminated and are based on average man days multiplied by the applicable rates.

63.     I have also calculated Taylors' loss of profit had the contract been performed up until 30 September 2004 applying the prices awarded to Senev SSI at the start of their contract with Esso Chad (assuming no further increases). This calculates as follows:

285 days x 500 expatriates per day x US $27.50 = US $3,918,750, plus
285 days x 500 nationals per day x US $8.00 = US $ 1,140,000

Total remaining catering income at US $5,058,750. Taylors' expected profit being 20% = $1,011,750. The loss of the Maintenance Contract profit would also needed to be added to this figure.

64.     Finally, I have calculated Taylors' loss of profit had the contract been performed up until 30 September 2004 applying the price increases awarded to Senev SSI throughout the duration of its contract with Esso Chad. Senev SSI was awarded an increase on 1 June 2004 for expatriates at US $38 per day and US $12 for nationals per day (almost double what Esso Chad was paying Taylors at the point of termination). This is calculated as follows:

163 days x 500 expatriates per day x $27.50 = $2,241,250, plus
163 days x 500 nationals per day x $8.00 = $ 652,000, plus
122 days x 500 expatriates per day x $38.00 = $2,318,000, plus
122 days x 500 nationals per day x $12.00 = $732,000.

Total remaining catering income at US $5,943,250. Taylors' expected profit being 20% = $1,188,650. Again, the loss of the Maintenance Contract profit would also needed to be added to this figure.

65. In addition, although Esso Chad did not formally communicate any increase to Taylors, as referred to in it's Answer & Counterclaim, Esso Chad awarded Taylors a rate rise with effect from 1 December 2003 (which has not been reflected in Taylors invoices for the period 1-19 December 2003). If the rate increase was to apply from 1 December 2003, then Taylors is also entitled to the following amount:

19 days x 7899 expatriates per day (over the 19 day period) x US $7.19 (US $27.50 – US $20.31) = US $ 56, 793.81

19 days x 9015 nationals per day (over the 19 day period) x US £1.31 (US $8 – US $6.69) = US $ 11,809.65

Senior/TCN Residents Casual Meals (US$3.88-3.56) x 89 = US$ 29.37

Local Residents Casual Meals (US$2.25-2.19) x 2102 = US$ 126.12

Total = US $ 68,758.95

66. The initial price granted by Esso Chad to Senev SSI under their contract was significantly higher than the price paid to Taylors as at the date of the termination of the Catering Contract. I believe this is indicative of the fact that Taylors was being underpaid by Esso Chad throughout the Catering Contract. This preferential treatment offered to Senev SSI is further highlighted by the further price increases awarded by Esso Chad throughout the Senev SSI contract and demonstrates how unfairly Taylors were treated by Esso Chad. By 1 June 2004, less than 6 months after the termination of the Taylors' Catering Contract, Esso Chad were paying Senev SSI almost double the prices they were paying Taylors up to 19 December 2003.

67. Taylors have incurred legal fees of approximately US $87,875.39 in these proceedings with the firm of Zukerman Gore & Brandeis. A copy of Zukerman Gore & Brandeis' invoices is attached to this statement marked exhibit "SA1". In addition, Taylors have to date paid the sum of $65,000 to the ICC. Taylors have also incurred further legal fees with DMH Stallard.

**SWORN** by SHABBIR ALI

on this       day of September 2005

2 6 SEP 2005
2 6 SEP 2005

Before me

A solicitor

Kingdom of Saudi Arabia
Western Province
City of Jeddah
Consulate General of the
United States of America

Subscribed and sworn to before me this
         day of   2 6 SEP 2005           , 20
by  Shabbir Ali

**MARK MCGOVERN**
VICE - CONSUL OF THE
UNITED STATES OF AMERICA