# EXHIBIT J

# WITNESS STATEMENT OF MR. DANIEL K. DEER

1. My name is Daniel K. Deer. I am over 21 years of age and am competent to make this Witness Statement. All of the statements contained herein are true and correct and, unless otherwise indicated, based on my personal knowledge. I declare under the penalty of perjury that the following is true and correct.

2. I currently reside in Houston, Texas, United States of America. Prior to beginning my business career, I received my undergraduate BBA degree with emphasis in accounting and economics from Texas A & I University in 1970. I have over 25 years of experience in oil and gas accounting and contract administration. Since 1983, I have been an independent contractor employed by various oil production companies (including Conoco, Mobil, Shell, and Oxy) to formulate, implement, and administer contracts related to oil production and distribution projects. I have been involved with projects all over the world. Prior to becoming an independent contractor in 1983, I worked for Coastal Corporation, Cattle-Land Oil Company, Hanson Energy Company, Transco and Cabot Oil & Gas Company for fifteen years as an oil and gas accountant.

3. I am currently an independent contractor engaged by Esso Exploration and Production Chad, Inc. ("Esso Chad"), working as a contract specialist. In that role, I perform contract formulation, implementation, and administration for Esso Chad's drilling and production work related to the Chad Cameroon Development Project ("Project").

4. I was hired by Esso Chad on August 13, 2001. Since that time, I have been involved with a majority of all of the contracts that Esso Chad maintains with its subcontractors working on the Project. Since the beginning of the Project, on average there are approximately 20 to 25 active contracts between Esso Chad and its subcontractors related to the Project, representing in excess of US $750,000,000 in total value.

30988567.1

5. In my role, my responsibilities include preparing bid tenders to submit to approved bidders for specific contracts related to the Project, receipt and evaluation of bid offers for contracts, continued oversight of contracts once they have been awarded, and facilitating any contract amendments that arise during the course of the contracts.

6. During the years 2001 through 2004, my responsibilities included formulation, oversight, and administration of Contract Number CDPF 050 (56045) for Catering and General Camp Services (the "Catering Contract"). This contract was for catering and facility services at the Komé Base Drilling Camp in Komé, Chad, as well as itinerant remote camps near Komé (collectively the "Drilling Camps").

7. As part of my work for the Project, I have traveled (and continue to travel) to Chad approximately two to three times a year.

A. ESSO CHAD'S BID TENDER AND AWARD OF THE CATERING CONTRACT

8. One of the initial projects that I worked on at Esso Chad was preparing a bid tender for the Catering Contract. Esso Chad provided me with the names of candidates for the Catering Contract. Included within the list of candidates was Taylors International Service, Ltd. ("Taylors").

9. I had some prior knowledge of Taylors, as I had eaten at a Taylors' catering operation in Kuwait while working for Bechtel. However, I had no direct contact with anyone from Taylors at that time; rather, my experience was strictly as someone who was being fed in a Taylors' catering operation.

10. I searched for Taylors' contact information on the internet and contacted them regarding the bid tender and to determine whether they were interested in submitting a bid offer. Mr. Glen Beal, Vice President of Business Development for Taylors, confirmed that Taylors was interested in bidding on the Catering Contract.

30988567.1

2

11. Prior to my initial contact with Mr. Beal related to the Catering Contract bid tender, I had not known of Mr. Beal and had never spoken to or worked with him.

12. On August 30, 2001, Esso Chad submitted the bid tender to the candidate companies – initiating the competitive, sealed bidding tender process for the Catering Contract. Within the bid tender was a proposed principal agreement for the Catering Contract. All of the candidates were given the opportunity to ask questions, request clarifications, object to terms and conditions of the principal agreement, offer substitute language for consideration by Esso Chad, and pursue any other negotiation protocols.

13. On August 30, 2001, Esso Chad received written notice from Mr. Beal that Taylors intended to submit a bid quote for the Catering Contract.

14. The deadline for submission of Taylors' bid offer was September 14, 2001. Following transmission of the bid tender to Taylors, the events of September 11, 2001, transpired. To avoid any issue with the bid offers being delayed due to potential issues with mail delivery, we contacted each bidder and arranged for them to submit their bids by secure facsimile. I spoke with Mr. Beal and he confirmed that Taylors' bid offer would be hand-delivered to my office, as Mr. Beal was also located in Houston, Texas.

15. Between the time that Taylors received the bid tender from Esso Chad (on August 30, 2001) and the date that Taylors submitted its bid offer (on September 13, 2001), I had very few conversations with Taylors related to the terms of the proposed Catering Contract. In my years of experience related to bid tenders and bid offers, negotiation of the terms of the contract by bidders (during the time between receipt of the bid tender and submission of the bid offer) is not uncommon.

16.     Here, Taylors did not attempt to negotiate any of the terms of the proposed contract with Esso Chad prior to submitting its bid offer. If Taylors had any concerns related to the terms of the proposed contract, they did not convey those concerns to me. If they would have done so, I would have raised those concerns with Esso Chad's management.

17.     On September 13, 2001, Mr. Beal hand-delivered Taylors' bid offer to my office in Houston, Texas. Taylors submitted no questions and did not attempt to negotiate any of the terms of the Catering Contract. Rather, Taylors accepted the terms of Esso Chad's tendered principal agreement without any discussion or negotiation. Thus, for example, Taylors agreed to be paid a certain rate (in U.S. Dollars), to pay for its labor and supplies in the national currency of Chad (which was tied to the European Union's Euro), and to give priority to the use of local Chadian labor and supplies.

18.     Between the time of Taylors' submission of its bid offer and Esso Chad's decision on the award of the Catering Contract, Mr. Beal and I met (along with Mr. Chuck Roberts and Mr. Dan Breeding with Esso Chad) to discuss the work related to the Catering Contract. During that meeting, Mr. Beal requested that, if Taylors were to be awarded the Catering Contract, Esso Chad provide Taylors with an interest-free "mobilization advance" of $75,000, to be repaid by Taylors through deductions against their invoices over the course of the Catering Contract. This request was not included within the Taylors bid offer.

19.     After reviewing and analyzing the bid offers from the candidates, Esso Chad awarded the Catering Contract to Taylors based upon the various representations contained within Taylors' bid offer.

20.     I notified Mr. Beal of the award of the Catering Contract to Taylors and the Catering Contract was executed on October 1, 2001, by Esso Chad and Taylors.

21. The Catering Contract required Taylors to provide catering and general camp services for Esso Chad employees and other workers in the Drilling Camps, with the catering and general camp services to be provided at a specified, per person, per day contract rate. The initial contract term was for three years, with a total estimated value of USD $5.2 million.

22. Shortly thereafter, Esso Chad issued an interest-free, mobilization advance of $75,000 to Taylors to help them mobilize their efforts at the Drilling Camps. Taylors agreed to repay this amount via deductions against its invoices to Esso Chad.

### B. TAYLORS EXPERIENCED VARIOUS PROBLEMS AND ESSO CHAD AGREED TO A REQUESTED RATE INCREASE

23. Shortly after the award of the Catering Contract to Taylors, my communication with Mr. Beal lessened and I began to communicate more directly with Mr. Vince Melvin.

24. Within a few months after the Catering Contract was executed, Taylors asked Esso Chad to amend the Catering Contract to increase the per person compensation rate. This request can be attributed to various poor management decisions by Taylors and its inability to accurately forecast/plan for the region.

25. On May 21, 2002, Esso Chad – in an effort to maintain a continuing supply of catering and general camp services to its employees and other workers – agreed to raise the per person compensation rate and executed an amendment to the Catering Contract. Specifically, Esso Chad agreed to raise the per person rates 25% – raising the per day rate for Expatriates/Third Country Nationals ("TCNs") from $16.50 to $20.63, and the per day rate for Chadian Nationals from $5.50 to 6.88. With this increase, and based on a camp population of approximately 1,000 individuals at a time (consisting of 50% Expatriates/Third Country Nationals ("TCNs") and 50% Chadian Nationals), Taylors' total billing for catering services was approximately USD $13,000 per day; USD $410,000 per month, and USD $4,900,000 per year.

26. With the rate increase, Esso Chad was confident that Taylors was receiving an amount of revenue that was more than sufficient to allow a prudently managed business to perform the duties required under the Catering Contract and return a reasonable profit.

27. During this phase of the Catering Contract work, Taylors was continually unable to correctly invoice for its services, monitor the timing/amounts of food being ordered, account for the number of individuals in the camps, or provide support for the amounts paid (and unpaid) to Taylors' subcontractors and suppliers. Taylors also seemed unsure as to how to invoice for customs and duties that it (purportedly paid for various supplies. Only after help from Esso Chad's Chadian employees was Taylors able to provide invoices in a manner that would be approved by Esso Chad under its invoicing guidelines. Taylors' invoicing problems appeared to be directly related, in large part, to Taylors' continued failure to place an accountant at the Drilling Camps during the first two years of the Catering Contract.

28. One of the issues related to the invoicing concerned Taylors' failure to invoice Esso Chad for value added tax ("VAT") that it paid to certain suppliers. Under the Catering Contract, and the laws/agreements surrounding the Project, Esso Chad would pay Taylors to reimburse it for certain VAT payments that it paid to certain suppliers. However, in the first stages of the Catering Contract, Taylors rarely submitted invoices for VAT reimbursement, and even when Taylors attempted to invoice for the VAT payment, they would not provide the correct information and/or documentation.

29. In June 2002, I was also aware of an audit concerning Taylors' performance at the Drilling Camps. The results of the audit were not favorable. Taylors was non-compliant in a substantial number of areas.

### C. ESSO CHAD DISCOVERED TAYLORS WAS FAILING TO PAY SUPPLIERS AND INITIATED WEEKLY CONFERENCE CALLS

30. Over the course of late May 2003 and early June 2003, Esso Chad received continuous complaints from Taylors' subcontractors/suppliers regarding lack of payments and Taylors' financial difficulties. Based upon these complaints – in particular, a complaint received from Mr. Don Norland, former United States Ambassador to Chad, who represented one of Taylors' suppliers – Esso Chad initiated mandatory weekly conference calls with Taylors. I attended these telephone conference calls on behalf of Esso Chad. Other Esso Chad individuals also attended the calls, including but not limited to, Mr. Ron Gregory and Mr. Garry Marshall.

31. On June 11, 2003, I sent email correspondence to Mr. Vince Melvin, the Camp Manager of Taylors in Chad, indicating that Esso Chad had been made aware of Taylors' lack of payment to its suppliers and asked that Taylors remedy the issue immediately. (*See* Exhibit A, June 11, 2003, Email Correspondence from Mr. Daniel Deer to Mr. Vince Melvin; ESSO 0000405; this document is a true and correct copy of the email prepared by me.) In response, I received an email correspondence from Mr. Shabbir Ali, on behalf of Taylors, indicating that he wished to arrange a meeting with Esso Chad. (*See* Exhibit B, June 13, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Daniel Deer; ESSO 0000408; this document is a true and correct copy of the email provided to me.)

32. I arranged for an initial telephone conference with Taylors for Wednesday, June 18, 2003. Mr. Shabbir Ali and Mr. H.N.A. "Sandy" Goodman – along with Mr. Melvin – attended for Taylors. While Mr. Goodman appeared to be either unaware of the issue and/or unconcerned by the failure of Taylors to pay its suppliers, Mr. Ali appeared to be fully aware of the situation.

33. Despite the fact that the purpose of the conference call was to discuss Taylors' failure to pay its suppliers, Mr. Ali consistently attempted to change the subject of the telephone conference to request that Esso Chad accelerate payments on Taylors' invoices and/or provide Taylors with relief from issues that it was facing due to the devaluation of the U.S. dollar compared to the Euro.

34. During the June 18, 2003, conference call, Esso Chad confirmed to Taylors the seriousness of the situation and made clear that Esso Chad believed that Taylors' failure to pay its suppliers posed both financial and reputation risks to Esso Chad. The Drilling Camps contained an operation of approximately 1,000 individuals, running twenty-four hours a day, seven days a week. If Taylors failed to pay its suppliers, thereby causing a shortage of food stocks, a work interruption would have been inevitable. In the end, Taylors acknowledged its failure to pay its suppliers and promised to remedy the situation.

35. It appeared from this initial telephone conference that Taylors' management had no true grasp of the on-site accounting related to its operations in Chad. This was likely due to the fact that they did not have an on-site accountant present in Chad.

36. Following the June 18, 2003, telephone conference with Taylors, I received email correspondence from Mr. Shabbir Ali, attaching correspondence and financial statements that purported to respond to demands made by Esso Chad in my June 11, 2003, email and in the June 18, 2003, conference call. (*See* Exhibit C, June 18, 2003, Email Correspondence From Mr. Shabbir Ali to Mr. Daniel Deer, ESSO 0000416 – ESSO 0000420; these documents are a true and correct copy of the email and attachments provided to me.)

37. The financial statements provided by Taylors – which were supposed to show Taylors' "cash management recovery plan," at a minimum – were not current and were not complete.

38. The spreadsheets Taylors provided regarding third-party supplier claims appeared to contain various misrepresentations regarding accounts payable amounts. We attempted to confirm with Taylors' suppliers the numbers provided by Taylors related to the amounts owed to its suppliers. The suppliers consistently confirmed that they were owed more than what was reflected on Taylors' financial reports.

39. In the correspondence attached to his email of June 18, 2003, and also during the June 18, 2003, telephone conference, Mr. Ali promised that Taylors would submit payments to its suppliers to bring them within their contract payment terms by no later than July 15, 2003.

40. On June 24, 2003, I received separate email correspondence from Mr. Vince Melvin and Mr. Shabbir Ali related to Taylors' payments to its suppliers. Mr. Shabbir Ali represented in email correspondence to me that Taylors had already paid its suppliers "more than half a million dollars and additional amount is being paid" to bring the Taylors' suppliers to within their contract payment terms. (*See* Exhibit D, June 24, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Daniel Deer, ESSO 0000424; this document is a true and correct copy of the email provided to me.) Mr. Vince Melvin confirmed in email correspondence to me that Taylors had received an Esso Chad payment of approximately US $400,000, and that all of the funds would be made available to Taylors' operations in Chad to pay its suppliers. (*See* Exhibit E, June 24, 2003, Email Correspondence from Mr. Vince Melvin to Mr. Daniel Deer, ESSO 0000423; this document is a true and correct copy of the email provided to me.)

41. A second telephone conference call between Esso Chad and Taylors was conducted on Friday, June 27, 2003.

42. During this conference call, the continuing problem of Taylors' delinquent payments to suppliers was discussed, and Esso Chad asked Taylors to provide it with an accounts payable aging schedule. Esso Chad also mentioned various options that Taylors might wish to pursue in order to alleviate Taylors' financial troubles.

43. Those options included seeking a possible hardship claim and/or currency exchange adjustment. However, neither of these options was guaranteed under the Catering Contract, or was suggested with any degree of certainty by Esso Chad that they would be accepted, and they were always offered subject to the evaluation of the merits of the claim/adjustment. Taylors indicated that it would pursue those options and Esso Chad requested various, necessary financial information that would be required to evaluate any request by Taylors.

44. Taylors provided an "aged creditor list" dated June 27, 2003. It was provided via facsimile and was largely illegible. However, the spreadsheet indicated that as of June 27, 2003, Taylors owed its suppliers in excess approximately US $1,600,000.

45. On July 2, 2003, in anticipation of a scheduled telephone conference set for Thursday, July 3, 2003, I sent email correspondence to Taylors requesting that Taylors provide, among other things, a revised, updated "aged creditor list" and the hardship claim discussed during the June 27, 2003, telephone conference. (*See* Exhibit F, July 2, 2003, Email Correspondence from Mr. Daniel Deer to Mr. Vince Melvin; ESSO 0000441 – ESSO 0000442; this document is a true and correct copy of the email prepared by me.)

46. In response to my email correspondence of July 2, 2003, I received Taylors' hardship claim from Mr. H.N.A. "Sandy" Goodman. (*See* Exhibit G, July 2, 2003, Correspondence from Mr. H.N.A. "Sandy" Goodman to Mr. Daniel Deer, ESSO 0000433; this document is a true and correct copy of the correspondence received by me; *see also* Exhibit H, July 2, 2003, Email Correspondence from Taylors to Mr. Daniel Deer, attaching spreadsheet, ESSO 0000431 – ESSO 0000432; these documents are a true and correct copy of the email and attachment received by me.) I also received two "aged creditor lists" from Taylors, the most updated version showing that as of July 2, 2003, Taylors owed its suppliers in excess approximately US $1,600,000. (*See* Exhibit I, July 2, 2003, Email Correspondence from Taylors to Mr. Daniel Deer, attaching spreadsheet, ESSO 0000429 – ESSO 0000430; these documents are a true and correct copy of the email and attachment received by me; *see also* Exhibit J, July 2, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Daniel Deer, attaching spreadsheet, ESSO 0000441 – ESSO 0000442, ESSO 0000446; these documents are a true and correct copy of the email and attachment received by me.)

47. In Mr. Ali's email correspondence sent to me on July 2, 2003, Mr. Ali again represented that Taylors promised to submit payments to its suppliers to bring them within their contract payment terms. (*See* Exhibit J.) This commitment was important to Esso Chad, as it was scheduled to meet with the Chad Chamber of Commerce on July 15, 2003, to discuss the status of the Project.

48. A telephone conference call between Esso Chad and Taylors was conducted on Thursday, July 3, 2003. During that telephone conference, various items were discussed, including Taylors' providing evidence of payments made to its suppliers, a list of payments to be made by Taylors, the need for Taylors to hire an on-site accountant, and the need for Taylors to

30988567.1

11

provide additional support for its hardship claim. (*See* Exhibit K, July 4, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Chuck Roberts, ESSO 0000448 – ESSO 0000452, ESSO 0000446; these documents are a true and correct copy of the email and attachment received by me.) In the meeting, Taylors made the following representations:

- Taylors would provide Esso Chad with a list of payments that Taylors had made to its suppliers in the last three weeks;

- Taylors would submit a list of payments that were overdue to suppliers and Taylors would satisfy those payments by July 11, 2003, using 100% of the amounts that Taylors received from Esso Chad;

- Taylors would submit a monthly "source and application" statement showing the financial data from the beginning date of the contract;

- Taylors would attempt to obtain a letter from one of its suppliers, Resourcium, to confirm that Taylors' payments to this supplier were current; and,

- Taylors was in the process of hiring an on-site accountant.

Following the conference call, Mr. Ali forwarded a statement showing that Taylors had paid its suppliers approximately US $1,000,000 during the month of June 2003. (*Id.*) Mr. Ali also forwarded a list of overdue suppliers that Taylors agreed would be paid prior to July 11, 2003. (*See* Exhibit L July 3, 2003, Email Correspondence from Mr. Shabbir Ali to Mr. Daniel Deer; these documents are a true and correct copy of the email and attachment received by me.) The list indicted that Taylors was to pay approximately US $935,000 to its overdue suppliers by July 11, 2003. Mr. Ali eventually forwarded a "source and application" statement; however, it was incomplete and did not provide the required information – namely, a statement showing where Taylors was spending the income generated by its Chadian operations.

49. Following the July 3, 2003, conference call with Taylors, I attempted to schedule the next conference call for July 18, 2003.



50. However, on July 16, 2005, Mr. Ali noted that he would be unable to attend any conference calls until after July 25, 2003. (*See* Exhibit M Email Correspondence from Mr. Shabbir Ali to Mr. Daniel Deer, ESSO 0000458; this document is a true and correct copy of the email received by me.)

51. Telephone conference calls between Esso Chad and Taylors were conducted on a weekly basis for the remainder of 2003. Over time, Mr. Goodman continually failed to attend the conference calls, and Mr. Ali became less and less available to participate in the conference calls.

52. During those calls, Taylors (usually Vince Melvin when Mr. Ali did not attend) continually assured Esso Chad of its continued commitment to pay its suppliers and provided representations that it was making payments to its suppliers. Importantly, at no time during the conference calls did Taylors deny that it had failed to pay its suppliers in a timely manner.

53. In the middle of October 2003, Taylors provided a summary of amounts due to its suppliers that indicated that the overdue amount had been reduced to approximately US $400,000 (from the June 2003 amount of US $1,600,000). (*See* Exhibit N, October 17, 2003, Email Correspondence from Mr. Raja Seshadri to Mr. Bob Baker, ESSO 0000538 – ESSO 0000540; this document is a true and correct copy of the email and attachment received by me).

54. A week later, Taylors provided an updated summary of amounts owed to its suppliers, noting that the overdue amount had been reduced to approximately US $100,000. (*See* Exhibit O, October 23, 2003, Email Correspondence from Mr. Raja Seshadri to Mr. Vince Melvin, ESSO 0000546 – ESSO 0000547; this document is a true and correct copy of the email and attachment received by me). These amounts appeared to be in line with Taylors' continued representations regarding the amounts it had paid to its suppliers. Based upon these reports, and

30988567.1

the continued representations by Taylors in the conference calls during this time period, it appeared that Taylors was very close to resolving the supplier payment issue.

55.  In the late fall of 2003, Esso Chad received several communications from Taylors' suppliers stating that Taylors had failed to pay them. This information directly contradicted the numerous representations Taylors had made to Esso Chad concerning the timely payment of suppliers. In a conference call with Taylors, this issue was raised by Esso Chad. In response, Mr. Shabbir Ali conceded that in previous conference calls when Taylors had represented that it had paid certain suppliers, Taylors had actually written checks to certain suppliers, but asked that the suppliers not cash those checks.

56.  In early December, Esso Chad learned of a local supplier that had not been paid, and was not listed on any of the "aged creditor lists" that were previously provided by Taylors. The existence of this unpaid supplier cast further doubt upon Taylors' previous representations that Taylors had resolved its financial issues. Upon further investigation, Esso Chad confirmed that Taylors' suppliers were owed significantly more than the amounts represented to Esso Chad by Taylors.

**D.  TAYLORS WAS UNABLE TO FULFILL CATERING CONTRACT AND REQUESTED TERMINATION OF THE CATERING CONTRACT**

57.  In December 2003, it was clear from the information that we were receiving from Taylors and from Taylors' suppliers that Taylors was in severe financial difficulty.

58.  On December 15, 2003, I received an email from Mr. Vince Melvin, attaching correspondence to Esso Chad that indicated that Taylors was no longer in a position to fulfill its contractual obligations, unless it received (a) an increase in the POB rates (retroactive to August 1, 2003) and (b) a payment of US $1,850,000 (to cover losses incurred by Taylors). (*See* Exhibit

P, December 15, 2003, Correspondence from Mr. Vincent W. Melvin to Mr. Mark Clawson; this document is a true and correct copy of the correspondence that I received.)

59. Following receipt of the correspondence, I spoke with Esso Chad individuals in Chad and in Houston. In a further effort to ensure a continuing supply of catering and general camp services to its employees and other workers, Esso Chad agreed to raise the per person compensation rate (a second time) from December 2003 forward to the rate requested by Taylors. However, Esso Chad could not agree to a payment of US $1,850,000 to Taylors for losses that Taylors brought upon itself and that were not related to any unpaid invoices from Taylors or any uncompensated good or services that Taylors might have provided to Esso Chad. Esso Chad communicated this decision verbally to Vince Melvin on December 16, 2003.

60. After receiving the December 15, 2003, correspondence from Mr. Melvin, Esso Chad also set about developing various contingency plans for providing the catering and facility services for the 1,000-plus individuals at the Drilling Camps if Taylors was unable to continue its operations. One option was to execute an abbreviated bid tender process to a select few catering and service providers. Another option was to approach CIS, who was operating a catering service for Esso Chad in a separate portion of the Drilling Camps, and determine their capacity for handling the added burden of a 1,000 person camp.

61. A third option was presented when Mr. Abderaman Bechir Breme ("Mr. Bechir") – the principal owner of the company (Senev-Tchad) that provided the majority of Taylors' labor for the Chad operations – Mr. Melvin, and Mr. Greg Salangros approached Esso Chad and suggested that Senev-Tchad, Mr. Melvin, and Mr. Salangros form a joint venture to continue to provide catering, maintenance and related services to the Project by using Senev Tchad's resources in Chad and Mr. Melvin's and Mr. Salangros' knowledge of the current operations.

30988567.1

15

62. On December 17, 2003, Taylors sent correspondence to Esso Chad and requested Esso Chad to terminate the catering contract, because of Esso Chad's refusal to pay Taylors' demand for US $1,850,000, an amount that represented a retroactive increase of the per person compensation rate that included amounts caused by Taylors' mismanagement. (*See* Exhibit Q, December 17, 2003, Correspondence from Mr. H.N.A. Goodman (signed by Mr. Shabbir Ali) to Esso Chad; this document is a true and correct copy of the correspondence received by Esso Chad.)

63. Following receipt of the December 17, 2003, correspondence, I spoke with various individuals within Esso Chad. In the face of Taylors' representation that it could not fulfill its obligations and was in danger of insolvency without a payment of US $1,850,000 – and in the face of the history of mismanagement and misrepresentations by Taylors – it was determined that Esso Chad had little choice but to terminate the Catering Contract as requested by Taylors.

64. Following the December 17, 2003, letter from Taylors, it was clear that Esso Chad did not have the time to perform any type of bid process, even an abbreviated version. Esso Chad chose Senev-SSI (the joint venture established between Mr. Bechir, Mr. Salangros, and Mr. Melvin) to replace Taylors. The persons involved with Senev-SSI had relevant knowledge of the operations via all of the former Taylors and Senev-Tchad individuals the joint venture would employ, and, furthermore, this would make the transition fairly seamless. Also, Esso Chad was not confident that CIS could provide the services necessary on short notice and it was clear that the Drilling Camps (with five operating oil rigs and 1,000 workers) were in dire need of a service provider to feed the workers, wash the clothes, perform the maintenance, and maintain hygiene in the camps.

65. On December 19, 2003, Esso Chad terminated the Catering Contract as requested by Taylors.

66. On December 19, 2003, Esso Chad – after receiving approval from its co-venture partners in the Project – issued a Notice to Proceed to Senev-SSI to proceed in place of Taylors. (*See* Exhibit R, ESSO 0002666 to ESSO 0002668.)

67. Mr. Melvin originally joined Senev-SSI; however, he resigned after approximately one month.

E. **TAYLORS' FAILURE CAUSED ESSO CHAD TO SUFFER DIRECT DAMAGES**

68. All of the Taylors issues caused direct damage to Esso Chad, including (but not limited to) the following:

- The cost associated with changing to a new catering provider;
- Esso Chad's payments to Taylors' suppliers;
- Esso Chad's payment for management travel to Chad to address Taylors' issues;
- Substantial loss of man hours devoted to the Taylors' issues – of all of the contracts that I administered related to the Project, Taylors' contract should have required only 5% of my time; however, due to the many issues created by Taylors, it was taking virtually all of my time from June 2003 through termination of the Catering Contract.

F. **TAYLORS' ACTIONS CAUSED ITS OPERATIONS IN CHAD TO FAIL**

69. In the end, the reason behind the failure of Taylors' operation in Chad was a pattern of poor management and lack of funding. Taylors' management continually failed to ensure adequate funding of the operations. As far as we could tell, Taylors provided little, if any, working capital to the operation. While the Taylors employees who worked at the Drilling Camps attempted to use this best efforts to support the Catering Contract operations, their efforts could not overcome the lack of financial support and operational management/controls.



70. At no point during my involvement with the Catering Contract and/or my communications with Taylors' individuals (including Mr. Melvin), did I ever engineer or conspire to force Taylors' Chadian operations to fail. Furthermore, I have no knowledge of any such actions by any Esso Chad individual.

Dated this 8th day of SEPT., 2005

_____
Mr. Daniel K. Deer

30988567.1

18

